FORD MOTOR CO. v. BENJAMIN E. BOONE, Inc., et al.*

(Circuit Court of Appeals, Ninth Circuit. August 20, 1917.)

No. 2884.

1. TRADE-MARKS AND TRADE-NAMES ⬧73(1)—UNFAIR COMPETITION—DECEPTIVE PRACTICES.

Even admitting the so-called agency contracts of plaintiff manufacturer of the Ford car, whereby the so-called agent is required to sell at a fixed uniform list price, and only to persons buying for immediate use, and not for resale, to be invalid, it is unfair competition for defendants, buying them from such an agent and reselling at less than list price, for the purpose of deceiving, to use plaintiff's trade-mark after the manner of a regular Ford agency, and to advertise that they are "Ford agents" and a "Ford auto agency."

2. SALES ⬧457—CONDITIONAL SALES.

A contract between the manufacturer of automobiles and one whom it purports to appoint agent for their sale, in limited territory, and only to users residing therein, and only at list retail price fixed by the manufacturer, and by which it agrees with him that in consideration of his paying 85 per cent. of such price, and of his promise to sell only in such territory, and only to a user, and only for such stipulated price, it will consign the cars to him, but will retain title till it shall have received the full consideration, if constituting a sale, constitutes a conditional sale, transferring a qualified title, though the 85 per cent. is required to be paid before it parts with possession of the cars; title passing only on compliance with the other conditions constituting part of the consideration.

3. CONTRACTS ⬧116(7)—CONDITIONAL SALE OF PATENTED AUTOMOBILES—VALIDITY.

Stipulation in sales to retailers by the patentee manufacturer of automobiles by which it retains title till the cars have been resold to a user at a stipulated price is not invalid as between them, as against the public policy; the manufacturer not being in exclusive control of an article of commerce for which there is no substantial substitute, but controlling only one of many similar devices which may be purchased on the open market, and the contract, so far as appears, not interfering with the free play of wholesome competition.

Appeal from the District Court of the United States for the District of Oregon; Robert S. Bean, Judge.

Suit by the Ford Motor Company against Benjamin E. Boone, Incorporated, and others. Bill dismissed, and plaintiff appeals. Reversed, with directions.

⬧For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes
*Rehearing denied October 8, 1917.

Platt & Platt and McDougal & McDougal, all of Portland, Or. (Alfred Lucking and L. B. Robertson, both of Detroit, Mich., and Harrison G. Platt, of Portland, Or., of counsel), for appellant.

Littlefield & Maguire, of Portland, Or. (E. V. Littlefield, of Portland, Or., of counsel), for appellees.

Before GILBERT and HUNT, Circuit Judges, and DIETRICH, District Judge.

DIETRICH, District Judge. The plaintiff company is the manufacturer of the Ford automobile. It maintains what it calls an agency for the sale of its cars and extras, and for repair work, at Portland, Or. The defendants are engaged in a general automobile business in that city, but have never been authorized by the plaintiff, either as agents or otherwise, to sell its products. The suit is brought to restrain them from engaging in what the plaintiff claims to be unfair practices, by which its rights are violated and the public is deceived. Upon the defendants' motion the bill was dismissed in the lower court, and the plaintiff appeals.

Sketching the complaint a little more fully, it shows that for about 12 years last past the plaintiff has been engaged in the manufacture and sale of automobiles invented by it, and commonly known as the "Ford car," "Ford automobile," or "Ford," the same being fully protected by patents; that it has spent large sums of money advertising the "Ford," and by reason of its inherent merit and as a result of such advertising the "Ford" has come into great public favor; that in advertising plaintiff has very generally used two trade-marks duly registered and fully protected by the United States copyright and trademark laws, namely, a design known to the trade and the public as the "winged pyramid," which carries in script the word "Ford" above the words "The Universal Car," and also the word "Ford" in script; that in the conduct of its business the plaintiff appoints agents in limited territories throughout the United States, and that the rights and duties of such agents are defined by a uniform contract; that in connection with the signs on their buildings and windows, and their advertising by the use of cards, letter heads, and other printed matter, such agents are required to use the word "Ford" or "Fords" in dress and style resembling such trade-marks or designs, and as a consequence of such common use by the plaintiff and its agents it has come to be understood generally by the public that persons making use of such expressions and designs are duly authorized agents for the sale of the plaintiff's product in the territory where such advertising is used; that, although they are without any authority whatsoever from the plaintiff, for the purpose of misleading the public and of fraudulently and unfairly diverting the plaintiff's trade, which belongs to it and its authorized agents, and of causing the public to believe that the defendants are the plaintiff's authorized agents, they, the defendants, have made and are making, and threaten to continue to make, certain false and misleading representations, particularly in that: First, they maintain in a conspicuous place upon their business building the word "Fords"; second, they have caused to be printed and use certain

posters upon oil cans containing automobile oil, upon which posters is a winged pyramid, with the script word "Ford" thereon, imitative of the plaintiff's trade-mark, and at the bottom of the poster the words "Benjamin E. Boone & Co., Ford Agents, Portland, Oregon"; third, they falsely and fraudulently represent to prospective purchasers of Ford cars that they are Ford agents, and that they obtain Ford cars in quantity from the plaintiff's factories; fourth, they have caused to be printed in the Portland classified index of the Pacific Telephone & Telegraph Company's directory the following: "Boone, Benj. E. & Co., Ford Auto Agency, 514 Alder St., Main 3966;" fifth, they have importuned certain of the plaintiff's "agents" to breach their "agency" contracts with the plaintiff, and in collusion with such agents they have sent in to plaintiff's factories false and fictitious orders for cars; sixth, they have advertised in the local papers the sale of Ford automobiles which they fraudulently obtained through the plaintiff's agents, at prices greatly below the regular, advertised, retail selling price of the plaintiff's cars.

The significance and materiality of the fifth and sixth specifications depend largely, if not entirely, upon the effect we give to the plaintiff's "agency contract," which the defendants contend is invalid. This contract is of great length, and we refer to such features only as have direct bearing upon the question of its validity. It purports to appoint an "agent" for the sale of the plaintiff's cars and of accessories and parts, and to provide facilities for making repairs. The right of the "agent" to sell is limited to certain defined territory. He may sell cars only to users residing in such territory, and only at the list retail prices fixed by the plaintiff. He must pay 85 per cent. of such list price in advance at the time of ordering the cars, and must pay freight charges and other expenses incident to the transportation of the cars from the factory to the agency, as well as taxes and insurance, and must suffer such loss, if any, as is sustained by injury to the cars from the time they leave the factory until they are delivered to the purchasing user. The 85 per cent. cash advance is the full money consideration which the plaintiff receives, but under the terms of the contract it retains complete title until a bill of sale signed by it has been delivered to the vendee, who shall be only a user, that is, one who purchases for immediate use, and not for resale. Additional compensation is provided for the "agent" over and above the 15 per cent. of the retail price by way of graduated commissions, depending upon the aggregate amount of sales during the year. The "agent" is required to "maintain on his own account and at his own expense a place of business and properly equipped repair shop, * * * and shall employ competent, efficient salesmen," and the plaintiff is not to be held responsible "for the rent, taxes, wages, or other charges or liabilities of any nature" arising out of or in connection with such business. Provision is also made for advertising and for many other details. The defendants' contention in brief is that, while the instrument is adroitly phrased, for the purpose of giving to the relation between the plaintiff and the other party, whom we shall call the consignee, the appearance of an agency, they in reality stand in the relation to each other of vendor and vendee.

244 F.—22

[1] The first question is whether or not, even if we assume the invalidity of the agency contract, the defendants may, in the conduct of their business, engage in the deceptive practices pointed out in the first four specifications. It is too narrow a view to take of the scope of the doctrine of unfair competition to say, as is suggested, that there can be no unfair competition in such case because admittedly the defendants are selling genuine "Ford" cars. If there is no advantage to them and no corresponding disadvantage to the plaintiff, why the pretense of being a Ford agency? The purchase of an automobile is not like the purchase of a sack of potatoes. An automobile is a complex mechanism, designed to be used for an indefinite length of time. Parts wear out and must be replaced. The ordinary purchaser realizes that he is incompetent to judge whether in all respects an offered car is up to the manufacturer's advertised standard. It is a consideration of some importance to him to be able to deal with the maker or its recognized agent. He desires the assurance that the article he purchases is standard; that it has the maker's guaranty; that he will be able to procure parts and accessories as he may need them; and, of course, that no question will be raised touching his title. Obviously the defendants could not give a prospective purchaser all of these assurances. If they are rightfully in possession of new "Fords," they may, as a matter of course, sell them where and to whom they please, and as an inducement they may cut the plaintiff's price, but they cannot, by pretending to be its agents, thus do it the double wrong of pirating upon its patronage, and also injuring it in the estimation of the public, by making it appear to be actually selling its cars at different prices, while professing to maintain the same price for all. Such deceptive practices are of the very essence of unfair competition.

"A distinctive name of a place of business will be protected as a trade-name against use or imitation by others. Deceptive signs and names upon a place of business or deceptive dress of a store will be enjoined. The right to the exclusive use of a distinctive name or sign in a particular locality may be acquired." 38 Cyc. 826.

It is suggested in their brief that the defendants did not expressly claim or advertise that they were "agents of the Ford Motor Company." It is true that they did not, by advertisement or otherwise, make such claim with precision or in technical language, but such a defense is as common as it is futile. As was said by Mr. Justice Bradley in Celluloid Mfg. Co. v. Cellonite Mfg. Co. (C. C.) 32 Fed. 97:

"It is not identical with the complainant's name. That would be too gross an invasion of the complainant's rights. Similarity, not identity, is the usual recourse when one party seeks to benefit himself by the good name of another. What similarity is sufficient to effect the object has to be determined in each case by its own circumstances. We may say, generally, that a similarity which would be likely to deceive or mislead an ordinary, unsuspecting customer is obnoxious to the law."

The defendants used plaintiff's trade-mark after the manner of a regular Ford agency. They falsely and with the intent to deceive advertised that they were "Ford agents," and that they are a "Ford auto agency," and for the same purpose they have fraudulently rep-

resented to prospective purchasers of Ford cars that they were "Ford agents." Admittedly they resorted to these practices for the purpose of deceiving, and there can be no question that the means employed were well adapted to that purpose. It may be that some people, with knowledge of the actual conditions, would purchase cars from the defendants for $25 below the current price, but, upon the other hand, it may very well be assumed that others would prefer to pay the additional $25 for the assurances and security supposed to attend purchases through a regular agency, and in its enjoyment of the trade which would naturally come to it from this latter class the plaintiff is entitled to protection against the defendants' unfair and deceptive practices.

[2] Passing now to a consideration of the validity of the agency contract: The defendants attach controlling significance to the fact that the consignee must pay the full money consideration before or at the time he receives the cars; the argument being that such payment ipso facto operates to transfer an unqualified title, notwithstanding the express agreement of the parties to the contrary. It is urged that the contract is only an adroit attempt to avoid the effect of certain decisions of the Supreme Court of the United States, such as Bobbs-Merrill Co. v. Straus, 210 U. S. 339, 28 Sup. Ct. 722, 52 L. Ed. 1086, Dr. Miles Medical Co. v. John D. Park & Sons, 220 U. S. 373, 31 Sup. Ct. 376, 55 L. Ed. 502, Standard Sanitary Mfg. Co. v. United States, 226 U. S. 20, 33 Sup. Ct. 9, 57 L. Ed. 107, Bauer & Cie v. O'Donnell, 229 U. S. 1, 33 Sup. Ct. 616, 57 L. Ed. 1041, 50 L. R. A. (N. S.) 1185, Ann. Cas. 1915A, 150, and Straus v. American Publishers' Ass'n, 231 U. S. 222, 34 Sup. Ct. 84, 58 L. Ed. 192, L. R. A. 1915A, 1099, Ann. Cas. 1915A, 369, and that it runs counter to the principles recognized in Straus v. Victor Talking Machine Co. (No. 374) 243 U. S. 490, 37 Sup. Ct. 412, 61 L. Ed. 866, decided April 9, 1917, and perhaps of the companion case, Motion Picture Patents Co. v. Universal Film Co., 243 U. S. 502, 37 Sup. Ct. 416, 61 L. Ed. 871, decided at the same time. The plaintiff cites, among others, Bement v. National Harrow Co., 186 U. S. 70, 22 Sup. Ct. 747, 46 L. Ed. 1058, and United States v. Keystone Watch Co. (D. C.) 218 Fed. 502, 514. It is to be admitted that the plaintiff, before parting with possession of its cars, requires the payment by the consignee of the entire money consideration which it expects to receive. Indeed, if the aggregate of the sales consummated by the consignee in a year exceeds a certain amount, the plaintiff is under obligation to return to it a part of the advance payment, by way of commissions. The defendants' contention, however, ignores the fact that there are other considerations deemed by the plaintiff to be valuable, and without the promise of which it would doubtless decline to enter into the contract. It agrees with the consignee that, in consideration of his paying 85 per cent. of the list retail price and of his promise to sell only within a certain territory to a user for a stipulated price, it will consign the car to him, but will retain title thereto until it shall have received the full consideration. May the consignee, knowing that the plaintiff will not deal with him unless he executes such a contract, assent to all of such

conditions, but with the intention of abiding by only one of them, and, upon the performance of this one, secure the absolute title to the car? If, instead of providing for the consignee's possession as soon as he pays the stipulated amount, it were agreed that the plaintiff should retain possession and deliver only to the purchasing user, could the consignee require delivery to himself, or to a dealer for resale? Or, if, instead of receiving payment of 85 per cent., the plaintiff received but 80 or 84 per cent., with the understanding that the right, and the only right, obtained by the consignee was to have possession of the car, with the power to negotiate a sale thereof to a user, to whom, and to whom only, the plaintiff would be bound to convey the title upon receiving the remaining 5 per cent., or 1 per cent., as the case might be, would there be any doubt of the retention of the title by the plaintiff, with the right to decline to convey to anyone other than the purchasing user? But other considerations are sometimes quite as valuable as the money to be paid for an article.

Admittedly the plaintiff has the right to sell its cars where and to whom it may choose, and for such price as it may see fit. It may decline to deal with the trade at all, and, dispensing with middlemen, sell directly to users, by mail, or through traveling salesmen or local agents. Accordingly it may lawfully appoint an agent at Portland authorized to sell its cars, limiting his authority to sales within a prescribed territory, and to users, and for a fixed price; and it may impose as one of the conditions of sale that it will not pass title except to the ultimate user and after such price has been paid in full. In short, the plaintiff may lawfully do precisely what it professes to be doing under the existing contract, and the question therefore is not whether its object is legitimate, but whether the means it employs are unlawful or are for some other reason ineffective. Even if it be held that the contract under consideration does not create an agency in the strict sense, but in effect provides for a sale, it is still clearly the understanding of the parties that it is a conditional or restricted sale, and that the title to the cars passes only upon a compliance with the other conditions, as well as that of paying the 85 per cent.

[3] The intent of the parties is clear enough, and the only question is whether effect can be given to such intent. It being a well-recognized principle of law that the vendor may retain title to the thing sold until the full stipulated consideration therefor shall have been paid (Bailey v. Baker Ice Mach. Co., 239 U. S. 268, 36 Sup. Ct. 50, 60 L. Ed. 275), it would seem that, if we are to hold the stipulation to that effect in this contract invalid, it must be because under the circumstances of the case such a transaction would be violative of some rule or principle of public policy. But, when the conditions are analyzed, what public interest would be subserved by striking down the contract and thwarting the intent of the parties thereto? As already suggested, it would be entirely possible for the plaintiff to accomplish all the objects which it seeks under the present plan, by marketing its product through its own agencies, so constituted that there could be no doubt that its salesmen were its agents merely, and not vendees. But, were it otherwise, what benefit would result to the public by open-

ing the door for the bushwhacking competition which, and which only, is likely to follow? It is to be borne in mind that the plaintiff has no monoply of the automobile business, but only of one out of almost innumerable kinds of cars, all differing in detail one from the other, but of the same general type and all designed to be used in the same general manner, and for the same general purpose. If, as was admitted to be the fact in the Motion Picture Patents Company Case, the plaintiff's car were wholly indispensable to the carrying on of a great industry, and if its plan of marketing were such as to constitute an instrument of oppression or favoritism, then the courts should perhaps be astute to discover means by which to disorganize its system and to encourage competitive effort as between the salesmen or distributors of its product; but such is not the case. Whatever its merits, the Ford car is not, except in the most remotely relative sense, essential to the well-being of the public or any group thereof, or any individual. There are other automobiles in great variety available to any one who has need and desires to purchase, some cheaper, some more expensive, some less efficient, some more efficient, some less attractive in appearance, others more attractive. Cole Motorcar Co. v. Hurst (C. C. A. 5th) 228 Fed. 280, 284, 142 C. C. A. 572. Obviously, therefore, the public already has competition to the fullest extent desirable, not a competition entailing the waste of duplication and overlapping effort in marketing the product, with sporadic price-cutting of an irrational sort, but the competition of many products, each independently seeking public favor, against one of like character, but slightly different. Is not each manufacturer now under the highest sort of pressure from without? Must it not be alert to discover new improvements and conveniences and to keep down to the minimum the cost of construction and distribution? It is a matter of public knowledge that fortunes are spent in advertising these competitive products, in an effort to attract and cultivate public favor. Under such conditions will the public be benefited by requiring the manufacturer to assume the further burden of internal guerrilla competition, with the confusion and waste entailed thereby? It is futile to say that such a burden will fall not upon the manufacturer or the public, but upon the local dealer or distributor. If there were ten dealers selling Ford cars in Portland, where there is now but one, would not the expense of marketing be greatly increased, and if, as is contended, the contract under consideration is harsh to the "dealer," does it not follow that, with the trade divided into ten parts, and with the expense of rentals and personal service multiplied, the price of the car to the public would increase? Does any one suppose that such dealers would for any considerable length of time cut the price? In the light of experience is it not so probable as virtually to amount to a certainty that the prices would soon reach a common level, and that level would be higher than the present one? Upon the other hand, will the public not have the benefit of the freest and most effective competition if each patentee manufacturer of automobiles is permitted to market his product in his own way? May it not be assumed that, impelled by considerations of self-interest, he will select the most economical meth-

od, and that the keen and vigorous competition of innumerable other manufacturers will force him to give to the public the major benefit arising from his economies? At least, we do not think that we would be warranted in holding that the contract here is inherently vicious. If, in fact, it is prejudicial to the public interest because to an unreasonable degree it operates in restraint of trade and interferes with the free play of wholesome competition, the defendants may plead and show the facts.

When we come to consider the decided cases, we find that no decision cited by either party from the Supreme Court of the United States involves the precise question, and that court, it is to be noted, appreciating from an early day the growing complexity of our industrial life and the importance of curtailing the liberty of contract only in so far as positive law or considerations of public policy might from time to time clearly require, has been careful to limit its decisions strictly to the matters directly in issue. Adams v. Burks, 17 Wall. 453, 21 L. Ed. 700; Bauer v. O'Donnell, 229 U. S. 1, 33 Sup. Ct. 616, 57 L. Ed. 1041, 50 L. R. A. (N. S.) 1185, Ann. Cas. 1915A, 150. And in reading the cases these considerations should be kept in mind: There is no attempt here to bind the purchasing public by a mere notice attached to the machine, nor is there any claim that a patent is of such force that a violation of the warning or the provisions of a notice of that character constitutes an infringement. If involved at all, the rights of the public are only remotely affected. The issue is between the patentee manufacturer and the consignee, who have expressly contracted with each other. In the second place, as we have seen, the plaintiff is not in the exclusive control of a useful or desirable article of commerce, whether patented or copyrighted, for which there is no substantial substitute; that is, it is without the power to oppress the public by fixing grossly excessive prices or imposing onerous and unreasonable conditions upon the use of its product. It controls but one of many similar devices which may be purchased upon the open market. In the third place, the plaintiff makes no attempt to restrain trade in unpatented or uncopyrighted articles of commerce by requiring the use thereof upon or in connection with its cars.

That this first consideration has been deemed to be an important one not only appears to be held in other jurisdictions (see Trust Laws and Unfair Competition, issued by the government printing office in 1916, pp. 579, 580, 592, 593, 651, 652), but is abundantly shown by the decisions of the Supreme Court already referred to. In Adams v. Burks, 17 Wall. (84 U. S.) 453, 21 L. Ed. 700, it was held that, while the purchasers from a patentee had the right to manufacture, sell, and use the patented article only within the limits of a circle of ten miles around Boston, as stipulated in the contract, a purchaser from them of a single patented article acquired the right to use it anywhere. Note, too, the distinction made in Keeler v. Standard Folding Bed Co., 157 U. S. 659, 15 Sup. Ct. 738, 39 L. Ed. 848:

"Where the patentee," such is the language of the court, "has not parted, by assignment, with any of his original rights, but chooses himself to make and vend a patented article manufactured, it is obvious that a purchaser can use

the article in any part of the United States, and, *unless restrained by a contract with the patentee*, can sell or dispose of the same." (Italics ours.)

And again, after reviewing a number of cases, the court says:

"Upon the doctrine of these cases we think it follows that one who buys patented articles of manufacture from one authorized to sell them becomes possessed of an absolute property in such articles, unrestricted in time or place. Whether a patentee may protect himself and his assignees by special contracts brought home to the purchasers is not a question before us, and upon which we express no opinion. It is, however, obvious that such a question would arise as a question of contract, and not as one under the inherent meaning and effect of the patent laws."

In Bobbs-Merrill Co. v. Straus, 210 U. S. 339, 350, 28 Sup. Ct. 722, 726 (52 L. Ed. 1086), it is said:

"In this case the stipulated facts show that the books sold by the appellant were sold at wholesale, and purchased by those who made no agreement as to the control of future sales of the book, and took upon themselves no obligation to enforce the notice printed in the book, undertaking to restrict retail sales to a price of one dollar per copy.

"The precise question therefore in this case is: Does the sole right to vend secure to the owner of the copyright the right, after a sale of the book to a purchaser, to restrict future sales of the book at retail, to the right to sell it at a certain price per copy, because of a notice in the book that a sale at a different price will be treated as an infringement, which notice has been brought home to one undertaking to sell for less than the named sum? We do not think the statute can be given such a construction, and it is to be remembered that this is purely a question of statutory construction. There is no claim in this case of contract limitation nor license agreement controlling the subsequent sales of the book."

In Bauer & Cie v. O'Donnell, 229 U. S. 1, 33 Sup. Ct. 616, 57 L. Ed. 1041, 50 L. R. A. (N. S.) 1185, Ann. Cas. 1915A, 150, confidently relied upon by the defendants, the issue was expressly defined by the court as follows:

"May a patentee by notice limit the price at which future retail sales of the patented article may be made, such article being in the hands of a retailer by purchase from the jobber, who has paid to the agent of the patentee the full price asked for the article sold."

And again:

"The real question is whether in the exclusive right secured by statute to 'vend' a patented article there is included the right, by notice, to dictate the price at which subsequent sales of the article may be made."

In United States v. Keystone Watch Co. (D. C.) decided by Judges Buffington, Hunt, and McPherson, 218 Fed. 502, 514, it was expressly held that:

"As the owner of these patents, the company had the right to make a direct agreement with the jobbers whereby a minimum price was fixed at which the jobbers might sell."

In stating the issue in one of the two most recent decisions (the Motion Picture Patents Company Case, supra), Mr. Justice Clark, speaking for the court, said:

"It is obvious that in this case we have presented anew the inquiry, which is arising with increasing frequency in recent years, as to the extent to which a patentee or his assignee is authorized by our patent laws to prescribe by

notice attached to a patented machine the conditions of its use, and the supplies which must be used in the operation of it under pain of infringement of the patent."

The case is also in striking contrast with what we have here, by reason of the fact that the plaintiff's patented device "is the only one with which motion picture films can be used successfully," and for the further reason that after the device was sold and paid for it continued to be subject not only to a restriction as to supplies which could be used with it, but to "conditions as to use or royalties which the company which authorized its sale might see fit after the sale from time to time to impose." Commenting upon this feature, the court said:

"The perfect instrument of favoritism and oppression which such a system of doing business, if valid, would put into the control of the owner of such a patent, should make courts astute, if need be, to defeat its operation. If these restrictions were sustained, plainly the plaintiff might, for its own profit or that of its favorites, by the obviously simple expedient of varying its royalty charge, ruin any one unfortunate enough to be dependent upon its confessedly important improvements for the doing of business."

In the Victor Talking Machine Case, supra, the court said:

"The abstract of the bill which we have given makes it plain: That whatever rights the plaintiff has against the defendants must be derived from the 'license notice' attached to each machine; for no contract rights existed between them."

The question in the Standard Sanitary Manufacturing Co. Case, as well as in Straus v. American Publishers' Association, was whether or not a combination of 80 per cent. of all the manufacturers of enameled ware or of 75 per cent. of all the publishers of books, copyrighted and uncopyrighted, for the purpose of fixing prices and eliminating competition, was exempt from the operation of the anti-trust laws, merely because enameling is a patented process, and some of the books published were protected by copyright. Clearly no such question arises here. Were the plaintiff in a combination with 75 or 80 per cent. of the manufacturers of automobiles, for the purpose of fixing prices and restricting competition, we would have a similar case. The chief reliance of defendants seems to be upon Dr. Miles Medical Co. v. Park & Sons Co., 220 U. S. 373, 31 Sup. Ct. 376, 55 L. Ed. 502. The complainant there was engaged in the manufacture and sale of proprietary medicines, prepared by means of secret formulas, but touching which there was no patent or other statutory grant. It adopted an intricate system for maintaining uniform prices to the retail as well as to the wholesale trade. In the respect in which the case has a bearing upon the question here under consideration, it may best be distinguished by the following excerpt quoted from the opinion:

"The first inquiry is whether there is any distinction, with respect to such restrictions as are here presented, between the case of an article manufactured by the owner of a secret process and that of one produced under ordinary conditions. The complainant urges an analogy to rights secured by letters patent. Bement v. National Harrow Company, 186 U. S. 70 [22 Sup. Ct. 747, 46 L. Ed. 1058]. In the case cited there were licenses for the manufacture and sale of articles covered by letters patent with stipulations as to the prices at which the licensee should sell. The court said, referring to the

act of July 2, 1890 (pages 92, 93): 'But that statute clearly does not refer to that kind of restraint of interstate commerce which may arise from reasonable and legal conditions imposed upon the assignee or licensee of a patent by the owner thereof, restricting the terms upon which the article may be used and the price to be demanded therefor. Such a construction of the act, we have no doubt, was never contemplated by its framers.'

"But whatever rights the patentee may enjoy are derived from statutory grant under the authority conferred by the Constitution. This grant is based upon public considerations. The purpose of the patent law is to stimulate invention by protecting inventors for a fixed time in the advantages that may be derived from exclusive manufacture, use, and sale."

It may be noted that the passage here quoted from Bement v. National Harrow Company was subsequently again approved in the Standard Sanitary Manufacturing Company Case, supra.

By drawing attention to the fact that the plaintiff's automobile here is covered by letters patent, we do not intimate the view that the patents of themselves would be a sufficient basis upon which to grant the relief sought. As has been frequently held, the statutes conferring exclusive rights upon the patentee do not of their own vigor perpetuate such rights indefinitely, and therefore an unconditional sale of a patented article releases it from the patentee's control. So, going a step further, the patentee cannot unconditionally sell the article patented, and by attaching a notice thereto so extend the scope of the patent as to enable him successfully to claim that a violation of the provisions of the notice constitutes an infringement of his statutory right, as was the contention in the "Sanatogen" Case (Bauer v. O'Donnell). The plaintiff here makes no such claim. It is asserting only the right, to be exercised within such limits as may be prescribed by statutory law or considerations of sound public policy, expressly to contract with the person to whom it delivers possession of its patented product to reserve to itself a measure of the absolute ownership and control with which admittedly it is invested. So far as we are advised by the contract, and that is all that we have before us, the plaintiff's system of selling its cars cannot be made the means of laying an unreasonable restraint upon the free play of competition or of dealing oppressively with the public. Presumably the contract was adopted in good faith, to accomplish an object which apparently is in itself legitimate. It is of no present interest that in some of its provisions it may be harsh, or even unenforceable as against the consignee; he is not complaining. If he desires to withdraw from the relation, that is his right, but he cannot at the same time claim all the benefits of the contract and repudiate its burdens.

The objection that the complaint is insufficient to disclose jurisdiction in the court below we have considered, but it is deemed to be without merit.

The judgment will be reversed, with directions to overrule the motion to dismiss, and to take further proceedings not out of harmony with the views hereinbefore expressed.