STANDARD FASHION CO. v. MAGRANE HOUSTON CO. *

(Circuit Court of Appeals, First Circuit.   June 28, 1919.)

No. 1343.

1. SALES ⊜84—CONSTRUCTION OF CONTRACT—DURATION.
    Where a sales contract ran for a term of two years, and from term to term thereafter, until terminated by three months' notice in writing given within 30 days after expiration of any contract period, the duration of the contract is automatically extended for another two-year term upon failure to give the required notice.

2. SALES ⊜58—CONSTRUCTION OF CONTRACT—NEGATIVE COVENANT.
    Where a sales contract ran for a two-year term, and from term to term thereafter, until terminated by three months' notice in writing given 30 days after expiration of any contract period, etc., a negative covenant not to sell certain goods during the term of the contract applies to the entire life of the contract, and not merely to the first two-year term.

3. SALES ⊜7—CONTRACT—DISTINGUISHED FROM AGENCY.
    A contract by which title to patterns passed to defendant, *held* a sales, and not an agency, contract.

4. APPEAL AND ERROR ⊜843(1)—JURISDICTION—INJUNCTION.
    That plaintiff's right to an injunction expired pendente lite does not relieve court from duty of determining substantial issues existing when case is argued upon appeal.

5. STATUTES ⊜225—CONSTRUCTION—CLAYTON ACT.
    The fact that the Clayton Act Oct. 15, 1914, was enacted after similar restrictions had been held not obnoxious at common law or under federal and state anti-trust laws, creates an inference that Congress intended to change the law.

6. MONOPOLIES ⊜17(2)—CLAYTON ACT—RESALE CONTRACT.
    A buyer's covenant not to sell patterns except those of seller, during term of a sales contract *held* to violate the Clayton Act Oct. 15, 1914, § 3 (Comp. St. § 8835c).

Appeal from the District Court of the United States for the District of Massachusetts; Chas. F. Johnson, Judge.

On rehearing.   Rehearing granted, and judgment of trial court affirmed.

For former opinion, see 251 Fed. 559, 163 C. C. A. 553.

Robert G. Dodge, of Boston, Mass. (Herbert Noble and James B. Sheehan, both of New York, on the brief), for appellant.

James W. Sullivan, of Lynn, Mass., for appellee.

Before BINGHAM and ANDERSON, Circuit Judges, and BROWN, District Judge.

ANDERSON, Circuit Judge.   After the per curiam opinion of June 28, 1918, the plaintiff petitioned for a rehearing.   The petition

---

was granted. The plaintiff has orally and on brief elaborately reargued the case. On careful reconsideration we are constrained to adopt the construction of the contract urged by the plaintiff and made by the court below.

Construing the contract as a whole, we do not think it can fairly be held so ambiguous as, if valid in all its provisions, to warrant the court in refusing the injunction prayed for.

The contract runs for a term of two years from date, and "from term to term thereafter, until this agreement is terminated as hereinafter provided." The provision for termination is:

"Either party desirous of terminating this agreement must give the other party three months' notice in writing within thirty days after the expiration of any contract period as above specified, the agency to continue regularly during such three months."

The contract is dated November 25, 1914. Its first two-year term ran to November 25, 1916; failing the three months' notice within thirty days thereafter, the contract then ran until November 25, 1918. Then for 30 days there was another opportunity to give the three months' written notice of termination. And so on from term to term.

[1, 2] We think the negative covenant (assuming for the moment it and the rest of the contract to be valid) is applicable to the entire life of the contract construed as to duration as we have indicated; that the contract shows a clear intention of the defendant to be bound for successive terms of two years, and for three months after notice of termination. We adopt, therefore, the construction put upon the contract by the court below.

[3] We also agree with the District Court that the contract does not establish an agency "properly so termed," but that it is a contract for sale. The case is easily distinguishable in this regard from Willcox & Gibbs Co. v. Ewing, 141 U. S. 627, 12 Sup. Ct. 94, 35 L. Ed. 882. Full title passed from the plaintiff to the defendant. The defendant was selling its own goods to its own customers; it was not, under delegated authority, selling plaintiff's goods to the plaintiff's customers.

See the cases collected and to some degree discussed in Ford Motor Company v. Union Motor Sales Co., 244 Fed. 156, 156 C. C. A. 584; and Ford Motor Company v. Benjamin E. Boone, Inc., 244 Fed. 335, 156 C. C. A. 621; cf. Mechem on Agency, §§ 44-48, and cases cited; Mechem on Sales, § 41 et seq.; 2 Corpus Juris, pp. 422, 423; John H. Pray & Sons Co. v. Appledore L. & Bldg. Co., 76 N. H. 167, 80 Atl. 337; Bendix v. Staveo Carridge Co., 174 Ill. App. 589, 595.

An agency is not created simply by calling a contract for sales an agency contract.

We may test the question whether the defendant was the plaintiff's agent engaged in selling the plaintiff's goods, or a vendee selling its own goods, by querying whether the plaintiff could be held liable in tort for the defendant's material and false misrepresentations made to a customer—such misrepresentations, for instance, as that patterns sold embodied the latest Paris fashion when in fact they were obsolete. Obviously, if the defendant was the plaintiff's agent, its misrepresenta-

tions, made in the course of the business of the agency, would bind the plaintiff. We think the plaintiff would be surprised to find this or any other court holding it responsible for such tortious conduct of the defendant with relation to the sale of these patterns.

The plaintiff admits that the notice of termination given by the defendant on April 7, 1917, followed by this suit brought on July 25, 1917, must be deemed applicable to the term of the contract expiring on November 25, 1918, as though given within 30 days after November 25, 1918. The plaintiff consequently admits that its right to an injunction expired on February 25, 1919.

[4] But the plaintiff insists that the fact that relief by injunction has now become inappropriate by reason of lapse of time does not warrant the court in refusing to retain jurisdiction in equity for the purpose of granting any appropriate relief, though it be only for the assessment of damages. Clark v. Wooster, 119 U. S. 322, 7 Sup. Ct. 217, 30 L. Ed. 392; Busch v. Jones, 184 U. S. 598, 22 Sup. Ct. 511, 46 L. Ed. 707; Cartwright v. So. Pacific (D. C.) 206 Fed. 234; Beedle v. Bennett, 122 U. S. 71, 7 Sup. Ct. 1090, 30 L. Ed. 1074; County of Mobile v. Kimball, 102 U. S. 691, 26 L. Ed. 238.

Assuming for the moment that the contract and all the stipulations thereof are valid, the great weight of authority is in favor of the plaintiff's proposition that it was entitled to an injunction against a breach of the negative covenant. Butterick Publishing Co. v. Fisher, 203 Mass. 122, 89 N. E. 189, 133 Am. St. Rep. 283; Standard Fashion Co. v. Siegel-Cooper Co., 30 App. Div. 564, 52 N. Y. Supp. 433; Id., 157 N. Y. 60, 51 N. E. 408, 43 L. R. A. 854, 68 Am. St. Rep. 749; Butterick Publishing Co. v. Chabot, N. Y. Law Journal, July 21, 1908, affirmed 128 App. Div. 900, 112 N. Y. Supp. 1123; Butterick Publishing Co. v. Rose, 141 Wis. 533, 124 N. W. 647; Peerless Pattern Co. v. Gauntlett Dry Goods Co., 171 Mich. 158, 136 N. W. 1113, 42 L. R. A. (N. S.) 843.

We think, therefore, that the plaintiff's contention that it is now entitled to a decision from this court either affirming or reversing the decision of the District Court must prevail. The plaintiff insists, and rightly, that the gist of the case is whether the Clayton Act Oct. 15, 1914, c. 323, 38 Stat. 730, invalidates its contract, in whole or any part, and that the fact that its right to an injunction has expired pendente lite does not relieve the court from the duty of determining the issues admittedly alive and involving substantial rights at the time of the argument of the appeal in this court.

[5, 6] Does section 3 of the Clayton Act (Comp. St. § 8835c) invalidate the negative covenant in this contract? We think it does, and that the decision of the District Court in that regard must be affirmed.

The mere fact that Congress enacted the Clayton Act after numerous courts had held similar or analogous restrictions not obnoxious to the Sherman Act July 2, 1890, c. 647, 26 Stat. 209 (Comp. St. §§ 8820–8823, 8827–8830), or invalid at common law, or under state antitrust statutes, grounds an inference that the Legislature intended in the light of actual experience, to change the law. Butterick Pub. Co. v. Fisher, 203 Mass. 122, 89 N. E. 189, 133 Am. St. Rep. 283; Brown

v. Rounsavell, 78 Ill. 589; Southern Fire Brick & Clay Co. v. Garden City Sand Co., 223 Ill. 616, 79 N. E. 313, 7 Ann. Cas. 50; Heimbuecher v. Goff, Horner & Co., 119 Ill. App. 373; Ferris v. American Brewing Co., 155 Ind. 539, 58 N. E. 701, 52 L. R. A. 305; J. W. Ripy & Son v. Art Wall Paper Mills, 41 Okl. 20, 136 Pac. 1080, 51 L. R. A. (N. S.) 33; In re Greene (C. C.) 52 Fed. 104; Mogul Steamship Co. v. McGregor, 1892 A. C. 25; Whitwell v. Continental Tobacco Co., 125 Fed. 454, 60 C. C. A. 290, 64 L. R. A. 689; Peerless Pattern Co. v. Gauntlett Dry Goods Co., 171 Mich. 158, 136 N. W. 1113, 42 L. R. A. (N. S.) 843; Sullivan v. Rime, 35 S. D. 75, 150 N. W. 556; Standard Fashion Co. v. Siegel-Cooper Co., 30 App. Div. 564, 52 N. Y. Supp. 433; Id., 157 N. Y. 60, 51 N. E. 408, 43 L. R. A. 854, 68 Am. St. Rep. 749; Butterick Publishing Co. v. Chabot, N. Y. Law Journal, July 21, 1908, affirmed 128 App. Div. 900, 112 N. Y. Supp. 1123; Butterick Publishing Co. v. Rose, 141 Wis. 533, 124 N. W. 647.

There is no answer to the suggestion of Judge Trieber in U. S. v. United Shoe Machinery Co. (D. C.) 234 Fed. 127, 150, that the "presumption is, not that Congress intended that the construction of the Sherman Act should control, but, on the contrary, that it should not control." And again quoting from Judge Trieber: "Evidently Congress was not satisfied to only prohibit actual lessening of competition, or monopolizing, but to make it unlawful for any person to do these acts, which may put it in his power to do so."

The very title of this act is significant—"An act to *supplement* existing laws against unlawful restraints and monopolies, and for other purposes."

In the report of the Senate Committee on Judiciary upon this bill is the following statement of the legislative purpose:

"Broadly stated, the bill, in its treatment of unlawful restraints and monopolies, seeks to prohibit and make unlawful certain trade practices which, as a rule, singly and in themselves, are not covered by the act of July 2, 1890, or other existing anti-trust acts, and thus, by making these practices illegal, to arrest the creation of trusts, conspiracies, and monopolies in their incipiency and before consummation. Among other of these trade practices which are denounced and made unlawful may be mentioned discrimination in prices for the purpose of wrongfully injuring or destroying the business of competitors; exclusive and tying contracts; holding companies; and interlocking directorates."

In the report of the House Committee there is also instructive language concerning section 3:

"Let us therefore consider what this section really accomplishes. It prohibits the exclusive or 'tying' contract made between the manufacturer and the dealer by purchase or lease, whereby the latter agrees, as a condition of his contract, not to use or deal in the commodities of the competitor or rival of the seller or lessor. It is designed merely to prevent this unfair trade practice now so common throughout the country, and which is generally regarded by every one who has given the subject any serious consideration as unjust to the local dealer and to the community and as monopolistic in its effects."

"What is the motive and purpose of the manufacturer in making or entering into such exclusive contract? It is undoubtedly his purpose to drive out competition and to establish a monopoly in the sale of his commodities in that particular community or locality. His contract by its express terms completely shuts out competition in the business of the local dealer with whom he makes it. The dealer bound by this exclusive contract not to handle the

goods, wares, and merchandise of another becomes the ally of the manufacturer in his effort and purpose to drive out competition in the locality or community in which such commodities are sold. This is done by means of extensive advertising, and let it be borne in mind also that this advertising is added in the price of the commodities and paid for by the consumer. If by the combined efforts of the manufacturer and the local dealer and the glowing and overdrawn and oftentimes false advertisements competitors are compelled to retire from the field, a monopoly in the particular community or locality is the invariable result. In this connection it is important to state that to-day in every village and locality where there is only a single store, and this exclusive or 'tying' contract is entered into between the manufacturer and the local dealer concerning any commodity, the exclusive or 'tying' contract gives both the manufacturer and the local dealer a complete monopoly of that particular commodity in the locality or community. That the effect of such a system is detrimental to the consumers and to the general public cannot be questioned for a moment.

"The public is compelled to pay a higher price, and local customers are put to the inconvenience of securing many commodities in their communities or through mail-order houses that cannot be procured at their local stores. The price is raised as an inducement. This is the local effect. Where the concern making these contracts is already great and powerful, * * * the exclusive or 'tying' contract made with local dealers becomes one of the greatest agencies and instrumentalities of monopoly ever devised by the brain of man. It completely shuts out competitors, not only from trade in which they are already engaged, but from the opportunities to build up trade in any community where these great and powerful combinations are operating under this system and practice. * * * When we consider contracts of sales made under this system, the result to the consumer, the general public, and the local dealer and his business, is even worse than under the lease system."

For present purposes the fact that this section was amended in conference before final enactment we regard as of little or no significance. The reports of the two committees illuminate the evils and dangers in the trade situation with which Congress was undertaking to deal. As frequently happens, debate and conference modified the legislators' views as to the best method of dealing with the evils aimed at. But we find no abandonment of the main purpose expressed in these committee reports. Restrictions of this sort that may substantially lessen competition or tend to create a monopoly are condemned as strongly in the final as in the original draft. Competition, actual or potential, was the object of the Congressional solicitude.

But we do not think it necessary to resort to the reports of the congressional committee or to debates in Congress in order to reach a confident conclusion as to the application of this statute to the contract between the plaintiff and defendant. Section 3 (Comp. St. § 8835c) reads as follows:

"It shall be unlawful for any person engaged in commerce, in the course of such commerce, to lease or make a sale or contract for sale of goods, wares, merchandise, machinery, supplies or other commodities, whether patented or unpatented, for use, consumption or resale within the United States or any territory thereof or the District of Columbia or any insular possession or other place under the jurisdiction of the United States, or fix a price charged therefor, or discount from, or rebate upon, such price, on the condition, agreement or understanding that the lessee or purchaser thereof shall not use or deal in the goods, wares, merchandise, machinery, supplies or other commodities of a competitor or competitors of the lessor or seller, where the effect of such lease, sale or contract for sale or such condition, agreement or understanding may be to substantially lessen competition or tend to create a monopoly in any line of commerce."

The contract now before the court provides in the plainest possible language that the purchaser shall not "sell or permit to be sold * * * on its premises * * * any other make or pattern, and not to sell Standard patterns except at label prices." In effect the plaintiff admits that the only way of escape from the condemnation of the statute is for the court to hold that this negative covenant may not "substantially lessen competition or tend to create a monopoly."

No such finding can be made. Observe at the outset that the condemnation of the statute runs, "where the effect of" such negative covenant *"may be* to substantially lessen competition or *tend* to create a monopoly." The language is *"may be,"* not "is" or "will be."

In order to condemn the negative covenant, it is not necessary that the court should find that it *will* lessen competition or *will* tend to create a monopoly; it is enough to find that it *may* lessen competition or *may tend* to create a monopoly.

On this record we are constrained to find that this restriction may substantially lessen competition and may tend to create a monopoly. It already appears that, out of some 52,000 pattern agencies in this country, the plaintiff or a holding company controlling it and two other pattern companies control approximately two-fifths. The restriction of each merchant to one pattern manufacturer must in hundreds, perhaps in thousands, of small communities amount to giving such single pattern manufacturer a monopoly of the business in such community. Even in the larger cities, to limit to a single pattern maker the pattern business of dealers most resorted to by customers whose purchases tend to give fashions their vogue, may tend to facilitate further combinations; so that the plaintiff, or some other aggressive concern, instead of controlling two-fifths, will shortly have almost, if not quite, all the pattern business.

We must consider this restriction in the light of the facts peculiar to the business to which the restraint is applied, to the conditions already achieved under such restraint, as well as the nature of the restraint and its effect, actual or probable. Viewing it thus, in the light of the surrounding circumstances, we are constrained to agree with the District Court that the negative covenant in this contract may lessen competition, or may tend to create a monopoly, or both, and is therefore obnoxious to the Clayton Act. See Chicago Board of Trade v. United States, 246 U. S. 231, 238, 38 Sup. Ct. 242, 62 L. Ed. 683.

To avoid possible misconception of this opinion, we add that we do not overlook that the contract in question also contains a stipulation to maintain resale prices. The validity of this provision is not raised by the pleadings, nor has it been discussed by counsel. Whether under the circumstances of this case such resale price stipulation is invalid, we do not decide. Bauer v. O'Donnell, 229 U. S. 1, 33 Sup. Ct. 616, 57 L. Ed. 1041, 50 L. R. A. (N. S.) 1185, Ann. Cas. 1915A, 150; Dr. Miles Medical Co. v. Park & Sons Co., 220 U. S. 373, 31 Sup. Ct. 376, 55 L. Ed. 502; Ford Motor Co. v. Union Motor Sales Co., 244 Fed. 156, 156 C. C. A. 584; Strauss v. Victor Talking Machine Co., 243 U. S. 490, 37 Sup. Ct. 412, 61 L. Ed. 866, L. R. A. 1917E, 1196, Ann. Cas. 1918A, 955; Motion Picture Co. v. Universal Film Co., 243

U. S. 502, 37 Sup. Ct. 416, 61 L. Ed. 871, L. R. A. 1917E, 1187, Ann. Cas. 1918A, 959; United States v. Kellogg Toasted Corn Flake Co. (D. C.) 222 Fed. 725, 728, Ann. Cas. 1916A, 78; Boston Store v. American Graphophone Co., 246 U. S. 8, 38 Sup. Ct. 257, 62 L. Ed. 551, Ann. Cas. 1918C, 447.

Our decision that the negative covenant cannot be enforced is enough to dispose of this case as a suit in equity. The pleadings do not raise, and we have not undertaken to consider and determine, the question of what rights, if any, the plaintiff may have, in some other action, to recover either for goods sold and delivered, or for damages for breach of the contract. Whether the invalid negative covenant and the resale price stipulation, either or both, taint the whole contract, and all sales made in the course of the business contemplated by such contract, we do not decide. See Continental Wall Paper Co. v. Voight, 212 U. S. 227, 29 Sup. Ct. 280, 53 L. Ed. 486; Connolly v. Union Sewer Pipe Co., 184 U. S. 540, 22 Sup. Ct. 431, 46 L. Ed. 679; Wilder v. Corn Products Co., 236 U. S. 169, 35 Sup. Ct. 398, 59 L. Ed. 520, Ann. Cas. 1916A, 118; McMullen v. Hoffman, 174 U. S. 639, 19 Sup. Ct. 839, 43 L. Ed. 1117; Roselle v. Beckemeir, 134 Mo. 380, 35 S. W. 1132; Fishell v. Gray, 60 N. J. Law, 5, 37 Atl. 606; Rosenbaum v. U. S. Credit Co., 65 N. J. Law, 255, 48 Atl. 237, 53 L. R. A. 449; King v. King, 63 Ohio St. 363, 59 N. E. 111, 52 L. R. A. 157, 81 Am. St. Rep. 635; 1 Parsons on Contracts (9th Ed.) p. 496; Wald's Pollock on Contracts, p. 484, and cases and notes; Pullman Car Co. v. Transportation Co., 171 U. S. 138, 151, 18 Sup. Ct. 808, 43 L. Ed. 108; Harriman v. Northern Securities Co., 197 U. S. 244, 25 Sup. Ct. 493, 49 L. Ed. 739; Bone v. Ekless, 5 H. & N. 924; Thomas v. Richmond, 12 Wall. 349, 356, 20 L. Ed. 453; Boylston Bottling Co. v. O'Neil, 231 Mass. 498, 121 N. E. 411, a decision by the Massachusetts Supreme Judicial Court on January 2, 1919.

The decree of the District Court is affirmed, with costs.

BROWN, District Judge (concurring). Full weight must be given to the final clause of section 3 of the Clayton Act—"where the effect of such lease, sale, or contract for sale, or such condition, agreement, or understanding, may be to substantially lessen competition or tend to create a monopoly in any line of commerce."

In determining the effect we must consider the thing upon which the effect is to be produced. This clause seems to require that the interpretation and application of section 3 of the Clayton Act should be according to the principles stated in the opinion of Mr. Justice Brandeis in Chicago Board of Trade v. United States, 246 U. S. 231, 238, 38 Sup. Ct. 242, 244 (62 L. Ed. 683):

"But the legality of an agreement or regulation cannot be determined by so simple a test, as whether it restrains competition. Every agreement concerning trade, every regulation of trade, restrains. To bind, to restrain, is of their very essence. The true test of legality is whether the restraint imposed is such as merely regulates, and perhaps thereby promotes competition, or whether it is such as may suppress or even destroy competition. To determine that question the court must ordinarily consider the facts peculiar to the business to which the restraint is applied; its condition before and after the restraint was imposed; the nature of the restraint, and its effect, actual or

probable. The history of the restraint, the evil believed to exist, the reason for adopting the particular remedy, the purpose or end sought to be attained, are all relevant facts. This is not because a good intention will save an otherwise objectionable regulation or the reverse; but because knowledge of intent may help the court to interpret facts and to predict consequences."

To predict the consequences of the defendant's agreement not to sell or permit to be sold on its premises, during the term of the contract, any other make of patterns, it is necessary to consider the peculiarities of the particular business to which the contract relates. We must also consider that the restraint is upon the use of the premises of the defendant for a limited period. See 251 Fed. 559, 560, 163 C. C. A. 553. It is evident that a restriction of this character did not constitute an inducement to the defendant to enter into the contract for carrying a stock of the plaintiff's goods. It is also evident that, so long as the defendant remained satisfied to carry only the single line of dress patterns that it had chosen, the agreement not to carry another line of goods was of no practical effect. It is operative to exclude competitors only in those cases where a customer may desire to add a second stock or to abandon his contract during its term. Of the exclusion of competitors which results from the fact that the wants of customers are supplied by the plaintiff, no complaint can be made.

The misapprehension as to the actual or probable effect of restrictions of this character as a means of introducing goods to the trade and of building up a monopoly was pointed out by the Supreme Court in United States v. United Shoe Mchry. Co., 247 U. S. 32, 66, 38 Sup. Ct. 473, 485 (62 L. Ed. 968):

"Besides, it is impossible to believe, and the court below refused to find, that the great business of the United Shoe Machinery Company has been built up by the coercion of its customers, and that its machinery has been installed in most of the large factories of the country by the exercise of power, even that of patents. The installations could have had no other incentive than the excellence of the machines and the advantage of their use, the conditions imposed having adequate compensation and not being offensive to the letter or the policy of the law;"

and by the court in United States v. United Shoe Mchry. Co. of N. J, et al. (D. C.) 222 Fed. 349, 414:

"It is impossible to believe that defendants' equipment is in so many shoe factories for any other substantial reason than the merits of what they have had to offer. To say that this is due, in any substantial degree, to the fact that its leases run beyond the terms of patents, or because of the exclusive use, prohibitive, or cancellation clauses, rests largely, if not entirely, upon assumption. But that the business of these defendants rests upon the lease provisions objected to in such a substantial amount as to constitute any factor of independent force in securing or maintaining a monopoly does not appear."

This was said in connection with contracts of a duration as long as 17 years, and applies with especial force to short-term contracts like that before us. It also was said in the opinion in that case (222 Fed. 407):

"A business contract, like a statute, is not to be upset 'upon hypothetical and unreal possibilities if it would be good upon the facts as they are.' Pullman v. Knott, 235 U. S. 23, 35 Sup. Ct. 2, 59 L. Ed. 105."

In applying the statute it must be judicially determined what the effect may be. This judgment must be more than a mere feeling of "possibility" arising in ignorance of facts which, if known, would destroy that feeling. It must be based on knowledge and upon a reasonable belief that, in view of existing facts, there is a "dangerous probability."

In the present case there is no evidence that any competitor of the plaintiff had ever been excluded from competition in the city of Boston or elsewhere because of inability to procure customers or a store in which he might market his goods. If the defendant desired to defend upon the ground that this contract, by reason of its effect upon the trade, was illegal, it was incumbent upon it to allege and prove such facts as would enable the court to make a reasonable prediction of consequences. Ford Motor Co. v. Benjamin E. Boone, Inc., 244 Fed. 335, 342, 156 C. C. A. 621. No such defense is made by the answer.

The defendant sets up in its answer that the plaintiff is a combination in restraint of trade, and that it is seeking an injunction against the defendant for the purpose of preventing competition and to establish a monopoly. The answer that the plaintiff is an unlawful combination of course states no defense.

The facts before us were brought out principally in the direct testimony of the plaintiff and upon cross-examination. They tend to show that the ordinary purchaser from the plaintiff is required to maintain a considerable stock of dress patterns, which soon go out of style, and have to be renewed by exchange, and that a single stock meets all the requirements of the ordinary dealer at retail. This being the case, the exclusion of competitors would presumably result from the fact that the plaintiff's customers were supplied, and did not desire to duplicate their stocks; but preferred to concentrate their efforts on the goods of their choice, rather than from any agreement not to handle the goods of others. It also appears that there are but few stores which handle more than one line of dress patterns, and that in some cases special contracts are made permitting it.

From the history of this clause of the Clayton Act to its final form it is quite evident that Congress rejected various drafts which would make a contract of this character void upon its face, and that the final clause was inserted to prevent the disturbance that might result to long-established methods of business by an indiscriminate condemnation of a large body of existing contracts because of their verbal form, irrespective of their actual or probable effect, and in recognition of the fact that where there is an established monopoly competition cannot be instituted or maintained unless the new competitor in the field can make a contract with some one to handle only its own goods and not to handle the goods of a company already dominating the field; that if such contracts were to be condemned irrespective of the trade in which they were made this might lead to effective suppression of competition, by enabling an established monopoly to place its goods in the shop of every competitor.

I am of the opinion that this court should not, upon this record and upon so incomplete a state of proofs, determine the invalidity of this

259 F.—51

contract. The question of the plaintiff's right, at the time of bringing his bill, to an injunction to restrain a breach of the negative agreement concerning the use of the premises, in spite of the authorities cited, is still very doubtful on principle.

The doctrine of Lumley v. Wagner, 1 DeG., M. & G. 604, has been much questioned. Lindley, L. J., said he looked upon Lumley v. Wagner "as an anomaly which it would be dangerous to extend." See Fry on Specific Performance (5th Ed.) §§ 860, 861, 862. In sections 857 and 858 the difficulties in distinguishing between express and implied negatives are discussed. So far as the negative agreement is not to do that which as a matter of fact is inconsistent with an affirmative and lawful agreement, it may be regarded as mere surplusage. It is only where the negative agreement goes beyond what is inconsistent with an affirmative and lawful agreement that it can be regarded as unreasonable. That a court of equity, while recognizing its inability to compel specific performance of a contract, should, nevertheless, by injunction, put compulsion upon a defendant who is answerable at law for his breach of contract, may result merely in the imposition of a penalty; and penalties are not favored in equity. The defendant's agreement not to use its premises for the sale of the goods of others was to fortify the agreement to "pay proper attention to the sale of plaintiff's patterns and to conserve the best interests of the agency at all times."

Ordinarily a party to a business contract for the purchase of goods may elect to break his contract and pay full damages. For a court of equity to put compulsion upon him by way of punishment for refusing to perform the contract is beyond its powers, and to attempt coercion without power to make it effective is too doubtful an experiment. In view of the decision of the Supreme Court in Javierre v. Central Altagracia, 217 U. S. 502, 30 Sup. Ct. 598, 54 L. Ed. 859, it is doubtful if the Supreme Court will approve the extension of the doctrine of Lumley v. Wagner to a contract like that involved in the present case.

I am of the opinion that on the present record we cannot properly determine that the contract is invalid under the Clayton Act. The statute does not create a presumption that such contracts are inherently vicious, nor does it impose upon the plaintiff the burden of proving that the contracts are not illegal. The presumption is of legality, and the burden is upon him who asserts illegality. The application of the statute should be made only upon full proofs. The consequences of applying it otherwise are too serious to be disregarded. The power of Congress to enact this statute is based upon the power to regulate interstate commerce. It may make an interstate contract illegal by reason of the incorporation therein of conditions relating to commerce of a purely local character, not within the power of Congress to regulate when not associated with an interstate contract. It would seem to follow that we cannot separate from the interstate commerce features of the contract the features that relate to a business wholly local, and nullify those features only, since this is directly inconsistent with the theory that by virtue of their connection with an interstate commerce contract Congress, in the exercise of its power over interstate com-

merce, may, provide that "it shall be unlawful for any person engaged in commerce, in the course of such commerce, to lease or make a sale or contract for sale \* \* \* on the condition," etc.

In view of the long continuance and wide extension of the method of doing business, through what the Supreme Court in Willcox & Gibbs Co. v. Ewing, 141 U. S. 627, 12 Sup. Ct. 94, 35 L. Ed. 882, regarded as agency contracts, and of the long-established trade usage of describing such contracts as agency contracts, irrespective of the fact that the title to the goods may pass from vendor to vendee, there must be a large body of outstanding contracts which might be so completely nullified that no recovery can be had by the vendors for goods that they have furnished under such contracts. It was not the intent of Congress to afford to persons who desire to escape from their contracts technical and merely verbal grounds to excuse a breach of contract.

It should be remembered that contracts in usual form, containing no negative agreements, are means of establishing monopolies and suppressing competition quite as effective as contracts containing negative agreements. Whether the expression is positive or negative is largely a mere matter of form. The effective means of establishing a monopoly is to get contracts to purchase goods. This must precede any agreement restricting the sale of other goods. The restrictive agreements may or may not have an effect according to the circumstances. Under some circumstances they may be an effective means for breaking a monopoly by instituting or maintaining competition. In the present case there is evidence that the largest competitor of the plaintiff is rapidly extending its business by affirmative contracts without restrictive conditions, and has a much more dominating position in the field than the present plaintiff. I can see no ground in the record for apprehension that anybody is likely to acquire a monopoly in the dress pattern business, in which, as the evidence shows, competition is very active.

I am unable to agree that this bill should be dismissed because the contract in question is unlawful under the Clayton Act. I concur in the result for the reason that I am of the opinion that the plaintiff, upon the filing of the bill, was not entitled to an injunction as a means of coercing the defendant to perform the principal contract to which the negative agreement was merely a subordinate and dependent provision, and for the reasons stated in our former opinion.