[Civ. No. 10457. Third Dist. Feb. 4, 1963.]

SHASTA DOUGLAS OIL COMPANY, Plaintiff and Appellant, v. WILLIAM J. WORK et al., Defendants and Appellants.

*Retired judge of the superior court sitting pro tempore under assignment by the Chairman of the Judicial Council.

Pickering & Marler, Brobeck, Phleger & Harrison, Moses Lasky and J. Ernest Harty, Jr., for Plaintiff and Appellant.

Halpin, Halpin & Leep, Ben Leep, Sydney Halpin, Leep & Saunders, Garry, Dreyfus & McTernan and Benjamin Dreyfus for Defendants and Appellants.

VAN DYKE, J.*—This is an appeal from a portion of a judgment. Shasta Douglas Oil Company is hereafter referred to as "appellant." The two respondents are hereafter referred to as "Work."

Appellant sued Work for possession of land and for money due and money misappropriated, totaling over $16,000. Its claims were upheld. Work cross-complained and claimed that by appellant's violation of California's Antitrust Law he had suffered damages. The jury awarded him the sum of $33,375. The court trebled the award under the provisions of the statute and, offsetting appellant's claims, gave Work a net judgment for $83,987.94. Appellant appeals from this portion of the judgment.

On November 30, 1956, Work began operating a gasoline service station upon a parcel of real property in Redding

---

*Retired Presiding Justice of the District Court of Appeal sitting pro tempore under assignment by the Chairman of the Judicial Council.

owned by E. B. Hinkle and Son, Inc., a gasoline wholesaler, under an oral arrangement which contemplated that Work would eventually purchase the property. On April 1, 1957, this arrangement was reduced to a written contract whereby Hinkle agreed to sell and Work agreed to buy the property for $85,000, with no down payment, on minimum monthly installment payments, including principal and interest, of $450 per month.

Thereafter, for some 16 months Work bought gasoline from Hinkle and resold it at the station. By August of 1958 Work owed Hinkle some $12,000 on open account for gasoline. At that time Hinkle sold its business, including the property being purchased by Work, and assigned its contract with Work to appellant.

Hinkle had sold gasoline to Work, and Work had in turn resold to consumers. When appellant purchased the property and took an assignment of the Hinkle-Work contract, a change was made in the handling of gasoline through the service station. Appellant and Work entered into a written consignment agreement which provided that appellant would deliver gasoline to Work, which he would "accept . . . on consignment, and . . . hold and sell . . . in accordance with the terms" of the contract. The contract provided that title to all gasoline delivered should remain in appellant until sold by Work; that he should sell the consigned gasoline at retail prices specified by appellant; that title to the proceeds of the sales remained in appellant; and that such proceeds were to be remitted by Work to appellant. Appellant agreed to pay Work a commission on the sale price computed by an agreed formula. The agreement further provided that it might be cancelled by either party at any time upon written notice to the other. Appellant and Work went along under the Hinkle-Work sales agreement, and under the consignment agreement, until August 1960. The sales agreement contained a provision that if Work became in default and remained so for 30 days, the contract automatically became a lease of the property from Hinkle to Work. All payments made by Work prior to default were to be treated as rental; and the contract would be forfeited and terminated, all monies paid by Work being retained by Hinkle.

In August 1960 appellant served notice on Work of the termination of the sales agreement for default. At that time Work was still indebted for $7,401.64 on the open book account arising out of gasoline purchased from Hinkle. He

had also failed to pay over to appellant, and, as appellant charged, had misappropriated $7,495.82 of proceeds of gasoline consigned to him. In the 46 months he had been in possession of the premises he had paid $6,118 on the principal of $85,000 purchase price of the land. Following the notice of termination of the Hinkle-Work contract, and on September 1, 1960, appellant filed suit against Work to recover possession of the premises, obtained a writ of possession, and on the same day the sheriff installed appellant in possession under the writ. In order to recover the $7,401.64 due on the open account and the $7,495.82 proceeds of gasoline sold under consignment, appellant filed action against Work for said sums. By his answers to the several causes of action Work admitted the execution of the two contracts we have referred to, but otherwise merely interposed a general denial. No defense of illegality was interposed, nor was any attempt made to invoke the court's equity powers to relieve Work of his default or to preserve any equity in the property. Instead, Work filed a cross-complaint alleging in substance the following: That by the agreements of sale and consignment aforesaid appellant had unlawfully maintained a maximum schedule of prices for the sale of petroleum products to Work and had unlawfully maintained a minimum schedule of prices for the resale of petroleum products by Work to the general public; that appellant by said agreements had unlawfully required Work to purchase all of his petroleum products from appellant at the schedule prices set by appellant; that appellant in addition to being in the wholesale gasoline distribution business sold gasoline at retail; that by reason of the foregoing the acts, agreements and arrangements made by appellant were against public policy and were illegal and void as being in violation of section 16600 et seq. of the Business and Professions Code. Work alleged damage as follows: (a) loss of equity in the real property $45,000; (b) loss of past profits $15,000; (c) loss of future profits $100,000.

The jury returned the following verdict: First cause of action, open book account, found for the plaintiff, Shasta Douglas Oil Company, and assessed damages at $7,401.64. Third cause of action, consignment agreement, found for the plaintiff, Shasta Douglas Oil Company, and assessed damages at $7,495.82. Complaint in action No. 25858, payments on property, found for the plaintiff, Shasta Douglas Oil Company, and assessed damages at $413.20. Cross-complaint,

found for the cross-complainants Work and assessed damages as follows: $33,375 for loss of equity in the real property, $0.00 past profits, $0.00 future profits.

In order to discuss the issues raised on the appeal, it is necessary to consider the contractual relations between the parties. By the contract of sale of the real property Hinkle agreed to sell gasoline to Work to be sold by Work at his service station at the price it was generally sold to other dealers in the area. As to the price at which Work would resell to the public, the contract contained nothing, and Work was free to set his price for sale to the public at any figure that suited him. But when Hinkle assigned the land sales agreement to appellant, Work and appellant changed the relationship through the execution of the consignment agreement. Under that agreement Work did not buy gasoline from appellant. On the contrary, appellant consigned gasoline to Work, retaining title, and Work sold the gasoline to the public as the agent or factor of appellant. He agreed to account for all sales to appellant, and it was his breach of this duty that formed the basis of one of the accounts in the complaint filed by appellant. The consignment agreement, therefore, constituted a modification of the land sales agreement and signally changed the relationships between appellant and Work with respect to the movement of gasoline through Work's station. As to the contractual relationships between Hinkle and Work before Hinkle assigned to appellant, it is not claimed, and could not be, that this contract in any sense violated the Cartwright Act. It fixed no price for resale and bound Hinkle to sell to Work at a price for Hinkle's products generally prevailing in the area. ▮▮ The change brought about by the consignment agreement likewise violated no provision of the Cartwright Act, for it is lawful for a consignor selling through a consignee to fix the price at which he authorizes the consignee to sell the goods of the consignor. (*United States* v. *Standard Oil Co.*, 78 F.Supp. 850, 854; *Gonzalez* v. *Derrington** (Cal.App.) 10 Cal.Rptr. 700, pp. 710-717; *United States* v. *General Elec. Co.*, 272 U.S. 476 [47 S.Ct. 192, 71 L.Ed. 362]; *Cole Motor Car Co.* v. *Hurst*, 228 F. 280, 283-284 [142 C.C.A. 572]; *Ford Motor Co.* v. *Benjamin E. Boone, Inc.*, 244 F. 335, 340 [156 C.C.A. 621].)

The court in essence told the jury that the consignment

---

*A hearing was granted by the Supreme Court on March 29, 1961. The final opinion of that court is reported in 56 Cal.2d 130 [14 Cal.Rptr. 1, 363 P.2d 1].

agreement violated the Cartwright Act and thereby committed error. The charge was as follows: "In the event Shasta Douglas Oil Company sells gasoline as a retailer, Shasta Douglas Oil Company cannot enter into a price-fixing agreement with the cross-complainant, Work, and is not excused from the operation of the law with respect to trusts." Appellant was retailing gasoline through its agent, Work. There was evidence also that at another place appellant was selling bulk gasoline to customers requiring such quantities. Taken in context the gist of the instruction was that an agreement (the consignment agreement) between an agent and his principal to sell gasoline for it at the price directed by it violates the Cartwright Act. As we have seen, this was error.

For proof of conspiracy in respect of prices at which appellant sold its gasoline through the Work station, respondents rely upon the following: One Kalbaugh, who shortly after the consignment agreement was entered into became the manager of appellant in the Redding area, testified in substance as follows: He was employed as manager by three individuals, Mr. D. L. Commons, Mr. George Goggins, and a Mr. Jack Nevius. They have offices in the Douglas Oil Company of California at Los Angeles. Commons is a vice president of that company, Goggins is an executive vice president of that company, and Nevius is director of marketing for that company. The Douglas Oil Company of California is a different corporation from the Shasta Douglas Oil Company. In connection with his duties he reported to Mr. Nevius direct at his headquarters in Los Angeles. As a part of his job he contacted various dealers who distributed Douglas gas in the Redding area. The arranging of commission, or the difference between the retail and wholesale price of gasoline as far as dealers were concerned, was done by instructions from Los Angeles. Mr. Commons and Mr. Nevius controlled the situation and one or both of them would tell him what commission the various dealers were going to be paid. The relationship between appellant and Douglas Oil Company of California was not made clear from the record, and as far as the record shows they are separate and nonconnected companies.

In line with Work's theory that there had been a conspiracy to fix the price of gasoline in the Redding area, Work requested and the court gave the following instruction: "The two or more persons required to form a trust can be any two persons. They can include a corporation and a private

individual; two corporations or two private individuals. The two persons do not necessarily have to be included as parties to this lawsuit. Furthermore, the two persons can include an employee of a corporation and the corporation itself or a parent corporation and a subsidiary corporation.'' This instruction was clearly erroneous, and taken in context it told the jury that the conspirators could be appellant and its agent, Work. (*Nelson Radio & Supply Co.* v. *Motorola, Inc.,* 200 F.2d 911, 914.) The prejudicial character of this instruction is shown by the occurrences at the trial. Anticipating the instruction would be given, Work's counsel, both in opening and closing arguments to the jury, dwelt on the subject. Thus he said : ''Another portion of the instruction . . . is the requirement that there be two or more persons. Judge Barr will instruct you that those two persons can be any two persons. They can include Mr. Kalbaugh and Douglas. They can include Douglas Oil Company of California and Shasta Douglas. They could even include Shasta Douglas and Mr. Work.'' And again, ''In that connection, Mr. Pickering seemed to suggest that the law required that Douglas conspire with somebody else. The truth of the matter is, these agreements are unlawful, if they are between Douglas and anybody else, Douglas and Work. It is the agreement itself that is unlawful, and the very assignment of the agreement is by itself a violation of the law.

''Furthermore, the combination that they speak of is two or more persons. Those two or more persons include, and furthermore the Judge will instruct to this effect, 'The two persons can include an employee of a corporation and a corporation itself, or a parent corporation.' ''

This instruction also was reread at the jury's request. We quote the following from *Nelson Radio & Supply Co.* v. *Motorola, Inc., supra,* at page 914: ''. . . It is basic in the law of conspiracy that you must have two persons or entities to have a conspiracy. A corporation cannot conspire with itself any more than a private individual can, and it is the general rule that the acts of the agent are the acts of the corporation. Here it is alleged that the conspiracy existed between the defendant corporation, its president, Calvin, its sales manager, Kelly, and its officers, employees, representatives and agents who have actively engaged in the management, direction and control of the affairs and business of defendant. This is certainly a unique group of conspirators. . . . [T]he conspiracy upon which plaintiff relies consists

simply in the absurd assertion that the defendant, through its officers and agents, conspired with itself to restrain its trade in its own products.'' Although we have referred to federal decisions under the Sherman Act, it is well settled that such cases are authoritative in cases under the Cartwright Act. (*Milton* v. *Hudson Sales Corp.*, 152 Cal.App.2d 418, 440 [313 P.2d 936].)

Although the erroneous instructions given could necessitate reversal and a new trial, we have yet to discuss a fatal flaw in the proceedings relevant to the Work judgment that requires not reversal but an order directing a judgment against Work on the cross-complaint. This has to do with proof of damages, for under the contractual arrangements between appellant and Work, and as a matter of law on this record, the latter could not conceivably have suffered damages flowing from any violation of the Cartwright Act and arising from the conduct of the parties under the consignment agreement. Briefly, the situation is this. First, it is basic in private actions under the Cartwright Act that the suitor must have suffered damages flowing directly from the violation of the Act. (*Clark* v. *Lesher,* 106 Cal.App.2d 403, 407 [235 P.2d 71] and cases cited.) Work claims that he suffered such damage in the following manner: That he was compelled under the consignment agreement to accept and abide by the commission as set for him by appellant; that he could obtain his gasoline from no other source; and further that he had attempted to get a greater commission and had been refused. The total result, he said, was the collapse of his business and consequentially the loss of his equity in the real property. It was for this loss, and this loss alone, that the jury awarded him damages. The difficulty with that theory of damage is that the consignment agreement is a modification of the sales agreement and carries within itself the seeds of its own destruction. It clearly states that either party can, at any time, cancel the consignment agreement without notice. Had Work canceled the agreement, as he could have (and if he were being damaged thereby, he should have canceled), he would have gone back to his status under the land sales agreement. By the provisions of that agreement he was entitled to buy from appellant, as successor to Hinkle, all gasoline needed for his station at the price generally prevailing in the Redding area; and he could sell it for whatever figure he pleased. If appellant refused to sell, Work could buy on the market. Actually, therefore, he was not bound to lose by

reason of the consignment agreement. He had the remedy squarely agreed to between the parties and simply for policy reasons of his own did not use it.

A person threatened with loss by the wrongful act of another is bound to exercise reasonable care and diligence to avoid loss and cannot recover for losses which might have been prevented by reasonable efforts on his part. As to losses preventable by reasonable efforts, the law considers them proximately caused by lack of such efforts. (*Valencia* v. *Shell Oil Co.*, 23 Cal.2d 840, 846 [147 P.2d 558].)

Work has appealed from an order taxing costs after the net judgment in Work's favor. Since we have reversed this judgment, the appeal of Work becomes moot.

Motion for judgment on the cross-complaint notwithstanding the verdict was made by appellant and denied. That part of the judgment appealed from by appellant and in Work's favor on the cross-complaint is reversed and the trial court is directed to enter judgment thereon that cross-complainant take nothing. This leaves appellant's recoveries on its actions brought against Work to stand.

Pierce, P. J., and Schottky, J., concurred.

A petition for a rehearing was denied February 27, 1963, and the petition of defendants and appellants for a hearing by the Supreme Court was denied April 3, 1963.