Richard S. SIMPSON, Appellant,

v.

UNION OIL COMPANY OF CALI-
FORNIA, Appellee.

No. 22148.

United States Court of Appeals
Ninth Circuit.

April 30, 1969.

Rehearing Denied June 12, 1969.

Maxwell Keith (argued) and James J. Duryea, San Francisco, Cal., for appellant.

Moses Lasky (argued) and Richard Haas of Brobeck, Phleger & Harrison, San Francisco, Cal., Douglas C. Gregg, E. A. McFadden, Los Angeles, Cal., for appellee.

Before JERTBERG, DUNIWAY and CARTER, Circuit Judges.

JAMES M. CARTER, Circuit Judge.

This case has been here before. It is an action for damages under the antitrust laws. On the first occasion the motion of Union Oil Company (hereafter

Union) for summary judgment was granted. (1961 Trade Cas. Par. 69,936, p. 77,693). We affirmed. Simpson v. Union Oil Company of California, 9 Cir., 311 F.2d 764 (1963). Certiorari was granted and the Supreme Court reversed 5–3, and remanded for further proceedings. Simpson v. Union Oil Company of California, 377 U.S. 13, 84 S.Ct. 1051, 12 L.Ed.2d 98 (1964); rehear.den. 377 U.S. 949, 84 S.Ct. 1349, 12 L.Ed.2d 313.

The case involved union's consignment of gasoline to service stations as a method of price maintenance. Since most of the problems resulting from the remand arise from language in the Supreme Court decision, supra, we quote pertinent parts:

> "Hence on the issue of resale price maintenance under the Sherman Act there is nothing left to try, for there was an agreement for resale price maintenance, coercively employed.

> The case must be remanded for a hearing on all the other issues of the case, including those raised under the McGuire Act, 66 Stat. 631, 15 U.S.C. 45, and the damages, if any, suffered. We intimate no views on any other issue; * * *. We reserve the question whether, when all the facts are known, there may be any equities that would warrant only prospective application in damage suits of the rule governing price fixing by the 'consignment' device we announce today." 377 U.S. at 24–25, 84 S.Ct. at 1059.

After remand and following a pretrial order of June 20, 1966, in the district court, appellant sought in the Supreme Court, a writ of prohibition or alternately a writ of mandamus, to preclude Union from asserting any "equities" which warrant prospective application of the *Simpson* decision, 377 U.S. 13, 84 S.Ct. 1051, 12 L.Ed.2d 98, supra, in any other court than the Supreme Court.

In the pretrial order above, the district court foreclosed the issues of whether Union had "attempted to monopolize" the wholesaling and retailing of gasoline in violation of Sec. 2 of the Sherman Act, and whether Union had unlawfully tied the sale of petroleum products to its leases in violation of Sec. 1 of the Sherman Act or entered into exclusive dealing contracts with its dealers. Accordingly, appellant also sought a writ in the Supreme Court, compelling the district court to try the aforesaid excluded issues. The applications for both writs were denied. Simpson v. United States District Court, 385 U.S. 806, 87 S.Ct. 188, 17 L.Ed.2d 121 (1966).

The case went to trial before a jury during January and February 1967 and resulted in a verdict for appellant against Union for $160,000. The trial court had reserved the "equities" issue for court decision. Union filed a motion for judgment N.O.V. and a motion for new trial. Appellant filed a motion to enter judgment upon the verdict. The trial court decided the "equities" issue in favor of Union; denied appellant's motion for judgment on the verdict; denied Union's motion for judgment N.O. V., but granted Union's motion for a new trial.

The trial court made findings of fact and conclusions of law on the "equities" issue, reported in Simpson v. Union Oil Company of California, 270 F.Supp. 754 (N.D.Cal.1967). By Finding 14 it found

> "On all the facts as they now have been made known by the trial of this case, it would be unfair and inequitable to apply to this damage action, wherein the operative facts all arose in the years 1956–1958, the rule respecting price-fixing by the consignment device announced on April 20, 1964 in Simpson v. Union Oil Company of California, 377 U.S. 13 [84 S. Ct. 1051, 12 L.Ed.2d 98]."

Its Conclusions 2 and 3 read

> "2. The belief of defendant prior to April 20, 1964 that the Retail Dealer Consignment Agreements between itself and retail gasoline dealers and the actions taken by it pursuant thereto were entirely lawful under the antitrust laws was reasonable and warrant-

ed by United States v. General Electric Company, 272 U.S. 476 [47 S.Ct. 192, 71 L.Ed. 362] and other authorities."

"3. The equities warrant only prospective application to damage suits of the rule respecting price fixing by the consignment device announced on April 20, 1964 in Simpson v. Union Oil Company of California, 377 U.S. 13, [84 S.Ct. 1051, 12 L.Ed.2d 362] and, particularly, do not warrant application of said rule to this case."

The court then entered its written Orders and Judgment. By the judgment

"plaintiff's action herein against defendant is dismissed with prejudice." [1] Its order with respect to a new trial was that "defendant's motion to set aside the verdict on said issues [the issues submitted to the jury] and to grant a new trial thereon should a further trial be necessary is hereby Granted."

In substance, the trial court denied appellant a judgment on the verdict because of its findings and conclusions on the "equities" issues; but hedging against possible reversal on this portion of the case, set aside the verdict and granted a new trial.

### The Questions Presented

1. Should the *Simpson* decision (377 U.S. 13, 84 S.Ct. 1051, 12 L.Ed.2d 362) be applied only prospectively and not to this case?

1. The motion for judgment N.O.V. was denied because the trial court stated there was "some" proof of damage. This concerned issues submitted to the jury. The dismissal of the action was on the "equities" issue, decided by the court and not submitted to the jury. There is no inconsistency.

2. At the trial Union withdrew the McGuire Act defense referred to in the Supreme Court order of remand.

As to the precluded issues, "attempt to monopolize" and "tie in sales to leases," they are not discussed in the briefs, although referred to in appellant's "Statement of the Case" and "Specifications of Error." They are "deemed abandoned

2. If the dismissal of the action was error, was there also error in granting a new trial?

 Other questions have been abandoned.[2]

### I.

### SHOULD THE SIMPSON DECISION HAVE ONLY PROSPECTIVE APPLICATION?

*(1) Constitutional objections.*

We treat at the outset contentions by appellant purportedly raising constitutional questions. Appellant claims that the trial court ruling that the "equities" are in favor of and compel a prospective application of the Supreme Court decision in *Simpson*, runs afoul of constitutional provisions. Appellant argues "courts are without power under the United States Constitution, requiring the separation of powers between legislature and the courts to take away or render nugatory a federally created right to obtain damages for an injury from a defendant's violation of the Sherman Act;" that to deny appellant relief is to deny him due process of law; and that setting aside of the verdict and the granting of judgment to Union denied appellant due process of law.

 A short answer is that no constitutional questions were raised or argued in the court below and therefore cannot be presented and need not be considered here. Williamson v. Weyerhaeuser Timber Co., 221 F.2d 5, 14 (9 Cir. 1955).

and need not be considered herein," Peck v. Shell Oil Co., 142 F.2d 141, 143 (9 Cir. 1944).

Moreover if the trial court was wrong in its decision as to the "equities" but was correct in granting a new trial no harm has been done appellant.

Appellant attempted to inject these issues in the case in 1966, 8 years after the case started and after Simpson had filed a Pretrial statement in 1965 which had *not* contained them. The trial court properly excluded them as untimely and as injected "solely because of plaintiff's dissatisfaction with the court's ruling" on the "equities" issue, and thereby protracting the trial. The trial judge acted properly.

■ It appears appellant is contending that every decision must operate retrospectively. This is based on an old archaic concept, now generally rejected. That concept is that the law has always been fixed and unchangeable and that where a court finds past interpretations are incorrect and proceeds to make a declaration of the law different from the past, the new rule applies to past events.

Judge Cardozo was one of the first to characterize the concept as unrealistic. See the discussion in United States ex rel. Angelet v. Fay, 333 F.2d 12, 15–16 (2 Cir. 1964) affirmed sub nom. Angelet v. Fay, 381 U.S. 654, 85 S.Ct. 1750, 14 L.Ed.2d 623 (1965). The Supreme Court has recently said in Linkletter v. Walker, 381 U.S. 618, 629, 85 S.Ct. 1731, 1737, 14 L.Ed.2d 601 (1965) "the Constitution neither prohibits nor requires retrospective effect." Great Northern Railway Co. v. Sunburst Oil & Refining Co., 287 U.S. 358, 53 S.Ct. 145, 77 L.Ed. 360 (1932) was an early case where a lower court refused to make its decision retrospective and Justice Cardozo, writing for the Supreme Court, rejected constitutional contentions. (p. 364, 53 S.Ct. 145).

■ As to the contention that appellant had been deprived of a jury trial, the short answer is the record below. This constitutional claim was not raised below and cannot be considered here, Williamson v. Weyerhaeuser, supra; Cox v. City of Freeman, 321 F.2d 887, 891 (8 Cir. 1963).

■ Likewise a court may set aside a verdict without constitutional encroachment. Neither the granting of the new trial nor the judgment as non-retroactive impinged on the constitutional provisions relied on by appellant.

(2) *The Trial Court Properly Considered and Ruled on the Equities Issue.*

■ The issue of the "equities" was properly before the trial court on re-mand. The Supreme Court said, " * * * when all the facts are known, there may be any equities that would warrant only prospective application * * * of the rule * * * we announce today." Obviously, the court was speaking of the *facts of this case.* There is no indication or reason to believe they were speaking *only of facts of other damage suits as they might arise in the future.* The 5th Circuit in Guidry v. Continental Oil Company, 350 F.2d 342, 344 (1965) stated that the reservation in *Simpson* "seemingly refers to the inequity to subjecting the Union Oil Company to a triple damage action for conduct that was apparently legal until the narrowing of United States v. General Elec. Co., 1926, 272 U.S. 476, 47 S. Ct. 192, 71 L.Ed. 362."

■ It is traditionally the function of the trial court to find the facts. The Supreme Court is ill equipped to carry out the fact finding process[3] and it would be absurd to read the Supreme Court's language to mean that the Supreme Court would take evidence and find the facts as to whether "equities" existed.

The trial court properly took evidence, and made findings of facts and conclusions of law as to whether there existed "equities that would warrant only prospective application * * *" of the rule the Court announced in *Simpson.* We think this was what the Court intended.

This fact finding was clearly to be performed by the trial judge and not by the jury. Moreover this duty was urged on the trial court by appellant and no objection as required by Rule 51, F.R. Civ.P., was made, when the court instructed the jury that the issue was taken from the jury and that the court would decide it.

3. In actions by one State against another State, of which the Supreme Court has original jurisdiction, masters are appointed by the Supreme Court to initially find the facts and report to the court.

*(3) The Test to Determine if the Simpson case should be Retrospective or Prospective in Application.*

Hanover Shoe, Inc. v. United Shoe Machinery Corp, 392 U.S. 481, 88 S.Ct. 2224, 20 L.Ed.2d 1231 (1968) held that American Tobacco Company v. United States, 328 U.S. 781, 66 S.Ct. 1125, 90 L.Ed. 1575 (1946) (in approving Judge Learned Hand's Alcoa analysis of "monopolization" as a violation of Section 2 of the Sherman Act in United States v. Aluminum Company of America, 148 F. 2d 416 (2 Cir. 1945)), had not altered the law of monopolization and that the problem of the retrospective or prospective application of a new rule of law was not involved in the case.

Appellant summarized language in *Hanover* (and Union agrees), as follows:

> "In its analysis of the issue the Supreme Court stated that the defense to liability under the Sherman Act because of reliance upon prior law could not even be raised unless (1) there was a clearly declared judicial doctrine, (2) upon which a defendant relied and (3) under which its conduct was lawful, (4) a doctrine which was overruled, (5) in favor of a new rule according to which conduct performed in reliance upon the old rule would have been unlawful."

█ Generally as to the problem of prospective application of a new rule of law, " * * * the Constitution neither prohibits nor requires retrospective effect." Linkletter v. Walker, supra; and Great Northern R. Co. v. Sunburst Oil & Refining Co., supra. Three alternatives were available in the instant case. The Court could have said, but did not, (1) that the rule applied to *Simpson* and all other cases prospectively; or (2) not to *Simpson* but to all other cases prospectively or (3) retrospectively to *Simpson* and all other cases.

There can be no doubt the Court intended "when all the facts are known" to determine if the rule announced in *Simpson* should apply to that case. What the Court does, when this case again reaches it, will determine whether the *Simpson* rule is retrospective or prospective and whether it should be applied to the *Simpson* case.

In Linkletter v. Walker, supra, the Court said, "Once the premise is accepted that we are neither required to apply, nor prohibited from applying, a decision retrospectively, we must weigh the merits and demerits in each case by looking to the prior history of the rule in question, its purpose and effect, and whether retrospective operation will further or retard its operation." (381 U.S. p. 629, 85 S.Ct. p. 1738).

█ Although the Court also said " * * * no distinction was drawn between civil and criminal litigation," (p. 627, 85 S.Ct. p. 1736) the Court meant that in either a civil or criminal case, the new decision might be retrospective or prospective depending on the determination of the factors set forth above.

We think that under the reasoning of *Linkletter*, supra, in applying the test set forth, there are various distinctions between civil and criminal cases bearing on the question as to whether the rule should be applied to the case at bar.

In the criminal case, whether the question arises on direct or collateral attack, the defendant has been convicted of a crime and the decision to be made is, the validity or invalidity of the conviction. That decision must be made in the particular case then on appeal or review. The court may also provide in the same case for its retrospectivity Witherspoon v. Illinois, 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776 (1968); or do so in a subsequent case Gideon v. Wainwright, 372 U.S. 335, 83 S.Ct. 792, 9 L. Ed.2d 799 (1963),—retrospective by Doughty v. Maxwell, 376 U.S. 202, 84 S. Ct. 702, 11 L.Ed.2d 650 (1964); or provide for prospective application only by a subsequent case, Mapp v. Ohio, 367 U. S. 643, 81 S.Ct. 1684, 6 L.Ed.2d 1081 (1961),—prospective for judgments after 6/19/61. Linkletter v. Walker, 381 U.S. 618, 85 S.Ct. 1731, 14 L.Ed.2d 601 (1965).

In three cases where the new rule was applied retrospectively, Griffin v. Illinois, 351 U.S. 12, 76 S.Ct. 585, 100 L.Ed. 891 (1956); Gideon v. Wainwright, 372 U.S. 335, 83 S.Ct. 792, 9 L.Ed.2d 799 (1963); and Jackson v. Denno, 378 U.S. 368, 84 S.Ct. 1774, 12 L.Ed.2d 908 (1964), "the principle * * * applied went to the fairness of the trial—the very integrity of the fact-finding process." Linkletter v. Walker, supra, (381 U.S. at 639, 85 S.Ct. at 1743).

Other considerations are "the necessity for an effective deterrent to illegal police action," and on the other hand "the wholesale release of the guilty victims." Linkletter v. Walker (381 U.S. at 636–637, 85 S.Ct. at 1741–1742). The reliance on the old rule in criminal cases is not by the litigant, the defendant. The reliance is on the part of the law enforcement officers. Johnson v. New Jersey, 384 U.S. 719, 731, 86 S.Ct 1772, 16 L.Ed.2d 882 (1966).

These considerations are not present in a civil case. The problem in the civil case is different, and the last paragraph of *Simpson* and the five way test from Hanover v. United Shoe Co., supra, point the way.

The major consideration is—did a party to the present litigation rely on a rule of law which has now been changed, so that it would be inequitable to apply the new rule to such party. There is another consideration which could conceivably come within the meaning of "any equities" referred to in *Simpson*. We note it briefly.

A substantial number of cases in which a plaintiff seeking damages has succeeded in persuading an appellate court to establish a new rule favorable to him, have applied the rule to him, but only prospectively as to all other possible plaintiffs. · The reasons seem to be two: (1) that it is unfair to the party who

has fought the case, sometimes through several courts, to tell him that he is right, but that he is to receive nothing for his efforts or his expenses, which may have been quite heavy, and (2) that there will be no incentive to a plaintiff to seek to have a new rule established, that is, to improve the law, if he is to get nothing for his pains if he succeeds.

Some, but not all of the cases seem to make a distinction between an individual plaintiff or small business entity, who for want of a better name we shall call the "one-time litigant" and the party which is a public body, a public utility, an insurance company or a major business corporation, to whom we shall apply the term "an institutional litigant."

The first reason above operates in favor of the "one-time litigant" who undertakes to have a new rule established when he sues an "institutional litigant" that has a continuing and recurring interest in the problem, such as an insurance company defending damage claims, a public utility defending similar claims, a manufacturer defending products liability cases, or a major company defending an antitrust case. By and large, the injured plaintiff in such cases is an individual or small business entity, who or which may have such a case only once in a lifetime. He gets no reward out of establishing a new rule in favor of others; if his damages are not recovered in the suit he brings, he will never get any. On the other hand, the "institutional litigant" that secures the establishment of a new rule, has the prospect of continuing future benefits from the rule, even if he does not get the benefit of the rule in the particular case. This may well be sufficient inducement for it to seek a new rule.

We cite in the margin[4] the cases in which an "institutional litigant" having

---

4. State ex rel. Wash. State Finance Committee v. Martin, 62 Wash.2d 645, 663–673, 384 P.2d 833 (1963) (the state v. the state treasurer); Southern Pacific Co. v. Cochise County, 92 Ariz. 395, 377 P.2d 770 (1963) (a tax case); Mutual

Life Ins. Co. of New York v. Bryant, 296 Ky. 815, 824, 177 S.W.2d 588, 153 A.L.R. 422 (1943); American-First Title & Trust Company v. Ewing, 403 P.2d 488 (Okl., 1965). As to such cases, see Levy, Realist Jurisprudence and Prospective

a continuing interest in the problem secured a new rule, favorable to it, in a particular case, but did not get the benefit of the rule in that case. Nevertheless, it stood to benefit by the rule in future cases.

When we turn to the "one-time litigant" who gets a new rule established, a number of the cases give him the benefit of his success in the case in which the new rule is established.[5] Other cases deny the "one-time litigant" the benefits of his victory.[6]

[ ] The second reason, i. e. the "incentive idea," would seem to be applicable to private antitrust plaintiffs. The Supreme Court, this court, and many other courts, have repeatedly emphasized that the private remedy was established by the Congress as a matter of public policy, to enlist persons injured by antitrust violations as enforcers by providing an inducement, treble damages plus expenses.[7]

[ ] The trial court did not consider this possible aspect of the equities.

Overruling, 109 U.Pa.L.Rev. 1, 17, 19 (1960). But the Arizona court in two other tax cases, has applied the new rule to the parties to the case, although declaring the rule to be prospective in other cases. Duhame v. State Tax Comm., 65 Ariz. 268, 179 P.2d 252, 171 A.L.R. 684 (1947); Arizona State Tax Comm. v. Ensign, 75 Ariz. 376, 257 P.2d 392 (1953).

5. Arizona State Tax Comm'n v. Ensign, 75 Ariz. 376, 257 P.2d 392 (1953) [tax]; Duhame v. State Tax Comm., 65 Ariz. 268, 257 P.2d 252 (1953) [tax]; City of Fairbanks v. Schaible, 375 P.2d 201 (Alaska 1962) [sovereign immunity]; Darling v. Charleston Community Memorial Hospital, 33 Ill.2d 326, 211 N.E.2d 253 (1965), cert. denied 383 U.S. 946, 86 S.Ct. 1204, 16 L.Ed.2d 209 (1966) [charitable immunity]; Molitor v. Kaneland Community Unit Dist., 18 Ill.2d 11, 163 N.E.2d 89, 86 A.L.R.2d 469 (1959); Parker v. Port Huron Hospital, 361 Mich. 1, 105 N.W.2d 1 (1960) [charitable immunity]; Sherbutte v. Marine City, 374 Mich. 48, 130 N.W.2d 920 (1964) [sovereign immunity of a municipal corporation]; Barker v. St. Louis County, 340 Mo. 986, 104 S.W.2d 371 (1937) [overruling prior cases which had upheld a 20-day statute of limitations for claims as to property taken for public use]; Rampone v. Wanskuck Bldgs. Inc., 227 A.2d 586, 589 (R.I.1967) [overruling prior rule that tenant could not sue landlord in tort for breach of covenant to repair. New rule applied to plaintiff, but otherwise only prospective as of 60 days after filing of opinion, "so as to afford all interested parties a reasonable opportunity to become aware of this decision and to be guided accordingly"]; Widell v. Holy Trinity Catholic Church, 19 Wis.2d 648, 121 N.W.2d 249 (1963) [charitable immunity]; Holytz v. City of Milwaukee, 17 Wis.2d 26, 115 N.W.2d 618 (1962)

[sovereign immunity]; Kojis v. Doctors Hospital, 12 Wis.2d 367, 107 N.W.2d 292 (1961); Goller v. White, 20 Wis.2d 402, 122 N.W.2d 193 (1963) [intrafamily immunity].

See also Culpepper v. Culpepper, 147 Fla. 632, 3 So.2d 330 (1941) where the court refused to apply to a pending case a rule *which had been applied* in the overruling case itself. Accord, Florida Forest and Park Service v. Strickland, 154 Fla. 472, 18 So.2d 251 (1944); Ellsworth v. Brown, 387 P.2d 634 (Okl.1963).

6. Continental Supply Co. v. Abell, 95 Mont. 148, 24 P.2d 133 (1933), where the court was badly split on the issue; Hare v. General Contract Purchase Co., 220 Ark. 601, 249 S.W.2d 973 (1952); Spanel v. Mounds View School District, 264 Minn. 279, 118 N.W.2d 795 (1962); Williams v. City of Detroit, 364 Mich. 231, 111 N.W.2d 1 (1961), where again the court was badly split. But see England v. Louisiana State Bd. of Medical Examiners, 375 U.S. 411, 84 S.Ct. 461, 11 L.Ed. 2d 440 (1964), a case in which the court declined to apply the new rule *against* the plaintiffs in that case.

7. Perma Life Mufflers v. International Parts Corp., 392 U.S. 134, 139, 88 S.Ct. 1981, 20 L.Ed.2d 982 (1968); Lawlor v. National Screen Service Corp., 349 U.S. 322, 329, 75 S.Ct. 865, 99 L.Ed. 1122 (1955); United States v. Borden Co., 347 U.S. 514, 518, 74 S.Ct. 703, 98 L.Ed. 903 (1954); Mach-Tronics, Inc. v. Zirpoli, 316 F.2d 820, 828 (9 Cir. 1963); Flintkote Co. v. Lysfjord, 246 F.2d 368, 398 (9 Cir. 1957); Karseal Corp. v. Richfield Oil Corp., 221 F.2d 358 (9 Cir. 1955); Byram Concretetanks Inc. v. Warren Concrete Products Co., 374 F.2d 649, 651 (3 Cir. 1967); Mechanical Contractors Bid Depository v. Christiansen, 352 F.2d 817, 821 (10 Cir. 1965); Osborn v. Sinclair Ref. Co., 324 F.2d 566,

There was good reason for its not doing so. First, the usual result in an action for damages is that if the plaintiff wins he gets a judgment for his damages. It is against this background that we must read the Supreme Court's comment, which refers to "equities that would warrant only prospective application * * * of the rule * * * we announce today." 377 U.S. at 24–25, 84 S. Ct. at 1059. We think that this means primarily that the appellant should recover unless there were equities favoring appellee that "would warrant" a denial of recovery to appellant, although it does not exclude the possibility of considering equities favorable to appellant, once equities favoring appellee have been shown. Thus, the trial court properly directed its attention to equities favoring appellee.

Second, if there are equities that favor appellant, other than the fact that he won the appeal, they ought to be brought to the court's attention. But appellant did not claim before the trial court that there were such equities favoring him. He merely argued (a) that he should be entitled to recover because he won the appeal regardless of the equities favoring appellee, and (b) that there were no equities favoring appellee. The nearest appellant came to arguing the point was in an objection to the court's finding 14, where he said "that this finding conflicts with the Congressional purpose and proper judicial enforcement of the antitrust laws." There was no discussion, no assertion that there were special equities favoring appellant. In a memorandum in support of his motion for entry of judgment in his favor, under the heading "The law encourages appeals and operates retro-

spectively to remedy a wrong," appellant cited several cases, only two of which are ordinary civil cases. These were Mosser v. Darrow, 341 U.S. 267, 71 S.Ct. 680, 95 L.Ed. 927 (1951) and Molitor v. Kaneland Community Unit School Dist., 18 Ill.2d 11, 163 N.E.2d 89 (1959). Again, there was no discussion, no claim that there were special equities favoring appellant. Reliance was solely on the bare fact that he was the successful appellant.

 This was the fact that the trial court necessarily weighed against the equities that it found to be favorable to appellee. We do not ordinarily reverse on grounds not properly presented to the trial judge. United States v. Hudspeth, 384 F.2d 683, 689 (9 Cir.1967); Stephens v. Arrow Lumber Co., 354 F.2d 732, 734 (9 Cir.1966).

The problem is fraught with difficulties, and we only hold that the trial court proceeded in a proper manner to consider the "equities" which should save union from liability to appellant.

(4) *A New Rule was announced by the Supreme Court in the Simpson case.*

We find it is clear that the Supreme Court announced a new rule in *Simpson*. The court's language concerning " * * * the rule governing price fixing by the 'consignment' device which we announce today," leaves no doubt. We do not intend to labor the point, except to cite the authorities relied on by the parties.

Union cites the line of supporting cases prior and subsequent to United States v. General Electric Co., 272 U.S. 476, 47 S.Ct. 192, 71 L.Ed. 362 (1926).[8] In that

---

572 (4 Cir. 1963) ; Kinnear-Weed Corp. v. Humble Oil & Ref. Co., 214 F.2d 891, 893 (5 Cir. 1954). Where is the incentive if, after winning, the plaintiff gets nothing? See Note, 71 Yale L.J. 907, 945 (1962).

8. The cases, in addition to General Electric, are Standard Oil Co. of Cal. v. United States, 337 U.S. 293, 296, 298, 310, 69 S.Ct. 1051, 93 L.Ed. 1371 (1949) ; Dr.

Miles Medical Co. v. John D. Park & Sons Co., 220 U.S. 373, 411, 31 S.Ct. 376, 55 L.Ed. 502 (1911) Holmes, J. dissenting; Boston Medical Supply Co. v. Lea & Febiger, 195 F.2d 853, 856 (1 Cir. 1952) ; Texas Co. v. Higgins, 118 F.2d 636 (2 Cir. 1941) ; United States v. General Electric Co., 115 F.Supp. 835 (D.N.J.1953) ; United States v. Richfield Oil Corp., 99 F.Supp. 280, 289 (S.

**906**

case it was definitely settled that consignment was not illegal under the antitrust laws, as a price fixing arrangement; that there was a distinction between an agency and a sale; and that the antitrust laws did not prohibit one from determining the price at which he sells his own property.

Thus, under the five-way test in *Hanover* there was a clearly defined judicial doctrine, under which Union's conduct was lawful, a doctrine which was overruled, in favor of a new rule according to which conduct performed in reliance upon the old rule would have been unlawful. There remains only the question of Union's reliance on the old rule, a subject we discuss in the next section.

*(5) Reliance by Union and the Equities*

Had the trial court allowed the verdict to stand and entered judgment thereon,

it would have been for $160,000 trebled, i. e. $480,000 plus attorney's fees.

Union had owned the leasehold on a service station in 1956. Relying on United States v. General Electric, 272 U.S. 476, 47 S.Ct. 192, 71 L.Ed. 362 (1926) it marketed its gas by consignment. Appellant, a former employee, helped put the consignment plan into effect. At his request he was given a lease for 1 year on Union's station which was later renewed for one year. For refusing to comply with his consignment agreement, the lease was not renewed.

Although some cases hold that reliance on existing law is presumed, State v. O'Neil, 147 Iowa 513, 126 N.W. 454, 457, 33 L.R.A.,N.S., 788 (Sup.Ct. of Iowa 1910), Continental Supply Co. v. Abell, 95 Mont. 148, 24 P.2d 133, 140 (Sup.Ct. of Mont.1933), Union offered proof of its reliance and the trial court

D.Cal.1951); affirmed per curiam 343 U.S. 922, 72 S.Ct. 665, 96 L.Ed. 1334 (1952); United States v. General Electric Co., 82 F.Supp. 753 (D.N.J.1949); United States v. Standard Oil Co. of Cal., CCH Trade Cas. Par. 69, 399 (1959); United States v. Standard Oil Co. of Cal., CCH Trade Cas. Par. 69, 212 (1958); Shasta Douglas Oil Co. v. Work, 212 Cal.App.2d 618, 28 Cal.Rptr. 190 (1963); Gorzalez v. Derrington, Cal.App., 10 Cal.Rptr. 700, 717 (1961), modified on other grounds 56 Cal.2d 130, 14 Cal. Rptr. 1, 363 P.2d 1 (1961); Westinghouse Electric Corp. v. Lyons, 125 N.Y.S. 2d 420 (Sup.Ct.N.Y.County 1953), affirmed 1 A.D.2d 770, 149 N.Y.S.2d 212 (Sup.Ct.App.Div.1956); Avon Prod. v. Berson, 206 Misc. 900, 135 N.Y.S.2d 867, 874 (Sup.Ct.N.Y.County 1954).

Union also cites cases and comments concerning the General Electric Rule, all stating that *Simpson* was a new rule in antitrust law, Sun Oil Co. v. F.T.C., 350 F.2d 624, 635 (7 Cir. 1965), cert. denied 382 U.S. 982, 86 S.Ct. 559, 15 L.Ed.2d 473 (1966); C.B.S. Business Equip. Corp. v. Underwood Corp., 240 F.Supp. 413, 424 (S.D.N.Y.1964); Lyons v. Westinghouse Elec. Corp., 235 F.Supp. 526, 535–537 (S.D.N.Y.1964); Brodley, Oligopoly Power Under the Sherman and Clayton Acts—From Economic Theory to Legal Policy, 19 Stan.L.Rev. 285, 320 (1967); Day, Developments in Antitrust During the Past Year, 25 A.B.A. Antitrust Sec-

tion 3, 32 (1964); Handler, Recent Antitrust Developments—1964, 63 Mich.L. Rev. 59, 60, 62–64 (1964); Rahl, The Demise of Vertical Price Fixing Through Consignment Arrangements: The Simpson Case, 29 A.B.A. Antitrust Section 216 (1965); Rahl, Control of an Agent's Prices: The Simpson Case—A Study in Antitrust Analysis, 61 Nw.U.L.Rev. 1 (1966); 2 Tulsa L.J. 55 (1965); Note, Antitrust—Consignment Agreements To Fix Retail Prices, 18 Vand.L.Rev. 222, 228 (1964); 10 Vill.L.Rev. 366, 368–69 (1965).

Appellant relies on: F.T.C. v. Texaco, Inc., 381 U.S. 739, 85 S.Ct. 1798, 14 L. Ed.2d 714 (1965); Atlantic Ref. Co. v. F.T.C., 381 U.S. 357, 85 S.Ct. 1498, 14 L.Ed.2d 443 (1965); United States v. Parke, Davis & Co., 362 U.S. 29, 80 S.Ct. 503, 4 L.Ed.2d 505 (1960); Standard Oil Co. of Cal. and Standard Stations v. United States, 337 U.S. 293, 69 S.Ct. 1051, 93 L.Ed. 1371 (1949); United States v. Masonite Corp., 316 U.S. 265, 62 S.Ct. 1070, 86 L.Ed. 1461 (1942); United States v. Socony-Vacuum Oil Co., 310 U.S. 150, 60 S.Ct. 811, 84 L.Ed. 1129 (1940); F.T.C. v. Beech-Nut Packing Co., 257 U.S. 441, 42 S.Ct. 150, 66 L.Ed. 307 (1922); United States v. Richfield Oil Corp., 99 F.Supp. 280 (S.D.Cal.1951), affirmed per curiam, 343 U.S. 922, 72 S. Ct. 665, 96 L.Ed. 1334 (1952); Stanton v. Texaco, Inc., 289 F.Supp. 884, 888–889 (D.R.I.1968).

made findings of fact and conclusions of law. They show that: Union's General Counsel was consulted about the consignment device and he advised Union that there were "no legal objections" and the device was "lawful both under the antitrust laws and all other laws." General Counsel studied, among others, the *General Electric* case and was "entirely satisfied" that "consignment and the proposed method of merchandising were lawful in every respect and would not violate the antitrust law;" that the consignment agreement was "modeled upon" and was "substantially the same" as the agreement and arrangement in *General Electric*, and was true and bona fide; that acting in reliance on its General Counsel's opinion, Union put the plan in operation; that in 1954 and at all times until the *Simpson* decision on April 20, 1964 it was the "general and uniform view" that *General Electric* was the law and "that the rule of the case applied to all kinds of merchandise, and was not confined to patented articles;" that Union "acted reasonably and justifiably;" that until the *Simpson* decision Union "reasonably believed" that consignment agreements were wholly lawful and did not violate the antitrust laws and that Union was fully justified in that belief.

 These findings were fully supported by the evidence and are binding on us. Appellant makes two attacks, one that the General Counsel did not give consideration to certain decisions. We have cited appellant's cases heretofore for reference and have held that the Supreme Court in *Simpson* knew it was announcing a new rule and so stated.

The second attack on the findings is that the General Counsel left enforcement of the agreements to a "marketing" department. If the consignment agreements were then legal it would fol-

low that Union would have a right to enforce them. One method of enforcement was refusal to deal with a consignee who breached his agreement. Thus Union refused to renew appellant's lease.

The court made a finding that this was the only "coercion"[9] used against appellant. It was supported by the evidence and by a stipulation entered between counsel at the trial. No agreement provided appellant must take any or all of his gasoline needs from Union. See Simpson v. Union Oil Co., 311 F.2d 764, 766.

We think the court's finding on coercion was supported by the record, and that since the consignment agreement was lawful under *General Electric* it was also lawful to enforce it by refusal to deal and refusal to renew the one year lease.

The findings of the trial court on the equities and reliance were fully supported by the record.

## II.

## THE ORDER GRANTING A NEW TRIAL

The trial court refused to enter a judgment on the verdict but instead dismissed the case with prejudice, because of Union's reliance on prior laws and because the "equities" warranted only prospective application of the new rule in *Simpson* and did not warrant application to the case at bar.

The trial court also granted Union's motion for a new trial "should a further trial be necessary."

 The grant or denial of a new trial rests within the sound discretion of the trial court and absent a showing of clear abuse of discretion will not be overturned on appeal. Oswald v. Cruz, 289 F.2d 488 (9 Cir.1961); Moist Cold Refrigerator Co. v. Lou Johnson Co., 249

9. See comments concerning the term "coercion" used in the *Simpson* opinion. Handler, *supra* note 8, at 64–5; Rahl, *supra* note 8, 29 A.B.A. Antitrust Section at 221–22; Rahl, *supra* note 8, 61 Nw.U.L. Rev. at 3, 8–9; 17 Stan.L.Rev. 519, 521–23 (1965); 2 Tulsa L.J. 55, 56–7 (1965); 37 U.Colo.L.Rev. 293, 294 (1965).

F.2d 246, 256 (9 Cir.1957), cert. denied 356 U.S. 968, 78 S.Ct. 1008, 2 L.Ed.2d 1074, where the court said:

"But having permitted the jury to come to its conclusion on the facts, *the trial judge then had the right, and indeed the duty, to weigh the evidence, as he saw it, and to set aside the verdict of the jury, even though supported by substantial evidence*, where, in his conscientious opinion, the verdict is contrary to the weight of the evidence or based upon evidence which is false, or to prevent, in the sound discretion of the trial judge, a miscarriage of justice." (Emphasis added).

■ Appellant's contention that the verdict was "well within the range of lost values to Mr. Simpson for the destruction of his business" does not rest on correct principles of law. Appellant also confuses the rule for granting a judgment N.O.V. with the rules for granting a new trial. A judgment N.O.V. is improperly granted if there is sufficient evidence to support the verdict, Williams v. Nichols, 266 F.2d 389, 393 (4 Cir.1959) where the case was remanded for an "analysis and appraisal by the trial court of the weight of all the evidence."

■ See Moore's Federal Practice, Sec. 5908(5) and particularly page 3817, where motions for a directed verdict or for judgment N.O.V. both raising the legal sufficiency of the evidence are "sharply distinguished" from a motion for a new trial which is "addressed to the sound discretion of the trial court." Liquid Veneer Corp. v. Smuckler, 90 F.2d 196 (9 Cir.1937), and Peterman v. Indian Motorcycle Co., 216 F.2d 289, 292 (1 Cir.1954) were cases where a motion for a new trial was denied. If they stand for the proposition appellant contends for,—that a verdict should not be set aside on a motion for new trial if "it can be sustained from any viewpoint of approach" (*Liquid Veneer*, page 205) they do not represent the present law of this circuit. Moist Cold Refrigerator Co. v. Lou Johnson, supra.

■ The power of a court of appeal to review the granting or denying of a new trial for excessive or inadequate verdicts or on the ground the verdict is against the weight of the evidence, is not as broad as that of the trial court in granting or denying the motion for a new trial in the first instance. Southern Pacific Co. v. Guthrie, 186 F.2d 926, 932–933 (9 Cir.1951), cert. den. 341 U.S. 904, 71 S.Ct. 614, 95 L.Ed. 1343; Siebrand v. Gossnell, 234 F.2d 81, 94 (9 Cir.1956).

No detailed listing of the evidence supporting appellant's theory of damages is necessary. The trial court stated that after the verdict was returned he was "shocked" with it. He granted the new trial on the grounds "that the verdict is against the weight of the evidence, shocks the conscience, is grossly and monstrously excessive, is the result either of passion or prejudice or of consideration by the jury of factors irrelevant to the litigation, is speculative, conjectural and a miscarriage of justice."

Appellant's theory of damage was that his business had been destroyed and he purported to offer proof on the value of his business as a service station operator. In Standard Oil Company of California v. Moore, 251 F.2d 188 (9 Cir. 1957), cert. denied 356 U.S. 975, 78 S.Ct. 1139, 2 L.Ed.2d 1148, this court had before it the question of valuing a retail gasoline business. It laid down the rule as follows:

"It was Moore's contention that his business had been totally destroyed on August 15, 1952, when he could no longer obtain gasoline. He therefore asked the jury to measure his damages by the market value of the business on that date. Moore owned the land and the other capital assets of the business, and retained them when he went out of business. It follows that the only value which his business had before it was closed that it did not have afterwards was its 'going concern' or 'good will' value.

"As one means of proving going concern or good will value, Moore pro-

duced the opinion testimony of an expert witness. The hypothetical question asked of this witness included, as one of its assumptions, that in August, 1952, Moore was forty-one years of age, was in reasonably good health, and wanted to continue the management of the service station. Appellants argue that the question, as so framed, was irrelevant to the issue.

"We agree. In measuring the value of the good will of such a business, appropriate factors to be considered are: (1) What profit has the business made over and above an amount fairly attributable to the return on the capital investment and to the labor of the owner? (2) What is the reasonable prospect that this additional profit will continue into the future, considering all circumstances existing and known as of the date of the valuation? See Kimball Laundry Co. v. United States, 338 U.S. 1, 16–17, 69 S.Ct. 1434, 93 L.Ed. 1765. These are the factors which would influence a prospective purchaser. The special value which the business might have to Moore, or the profit potential of the business beyond that which would be transferable to a purchaser, would have no effect on market value of the business.[44]"

"44. Moore retains his life expectancy and business acumen. Assuming that he is entitled to, and so receives, the market value of the destroyed good will of his business, he can, at least theoretically, do as well with it as he could have done by continuing in business at his Fourth Avenue South location."

Appellant proceeded however as if his case was one involving personal injuries. He premised his proof on the theory that he could operate the station for his life expectancy, 24 years, and on a calculation of net profits for the period; and on the further assumption that, having lost the business, he would never have any other earnings for the rest of his life, just as if he had been personally permanently disabled.

Appellant's damage, if any, resulted from (1) lost profits, if any, during his operation of the station because of the illegal restraints imposed on him by Union, and (2) the refusal of Union to renew his second one year lease and such further renewals as might be reasonably anticipated.[10] There was evidence of Union's policy to continually renew leases. A buyer, in valuing appellant's business, could reasonably take into account Union's renewal policy. But any damage suffered was, in general terms, damage to a going business and not personal injury or damage which would thereafter deprive appellant of all earning power from his services. The proper measure of damage was the market value of the business, i. e. the value of the goodwill of an operating business, and not the loss of earning power by appellant for his life time.

There was evidence that appellant remained in possession after his lease expired in May 1958 until June 5, 1958. He then operated a Mobil station for 2 years. After leaving the Mobil station he never again engaged in any branch of the oil or gasoline business, and the record shows he had no desire to.

The proof also showed from his profit and loss statement that his "take home" from the Union station averaged $473.43 per month and from the Mobil station $476.95 per month. He worked 17 hours per day, 7 days a week during his first year at the Union station and during the second year 12 hours per day 7 days a week. But the "take home" was not net profits from a business, since no allowance was made for the value of his labor.

The earnings from the station were only material in so far as they had a bearing on the market value of the business. Except in this respect, appellant's earnings were totally irrelevant. The issues should have been, what was the value of the business, what money did appellant have invested in it, what was

10. There were also minor items of damage such as loss on sale of equipment, etc.

its net income *after* deducting a fair return on capital and fair compensation to appellant for his work, what were the prospects of continual renewals of the lease and finally, if illegal restraints were removed, what were the prospects of additional profits from the business as it became better established. These are the factors that a willing buyer would consider in determining fair market value of the business.

Appellant's expert accountant played with figures, computed sums of money appellant *might* have earned at the service station and multiplied it by 24 years, his life expectancy. The $160,000 represented the present discounted value of about $10,500 per year over the 24 years period.

Clearly this type of evidence and computations does not comply with the method to value the loss of a business. No allowance was made for the value of appellant's labor, Standard Oil Company v. Moore, supra; and there was no diminution by reason of appellant's continued earning capacity.

Contention is made by appellant that affidavits taken from jurors and before the court caused or played a part in, the trial judge's decision to grant the motion for a new trial. Without discussing the appropriateness of such affidavits in this case, it is sufficient to state that the trial court expressly stated, in ruling on the motions for new trial that he did not rely on the jurors' affidavits.

■ We agree with the trial court that a $160,000 verdict for refusal to renew a one year lease is "monstrous" and against the weight of the evidence. The trial court did not abuse its discretion in granting a new trial.[11]

The judgment is affirmed.

---

11. Union properly requested instructions based on Standard Oil Co. of Cal. v. Moore, 251 F.2d 188 (9 Cir. 1957), cert. denied 356 U.S. 975, 78 S.Ct. 1139, 2 L.Ed.2d 1148 (1958). They were rejected and exception taken. Union also requested an instruction that the jury should consider appellant's earning power in other occupations. It was also refused and exception taken. Thus the case went to jury much like a personal injury case in which the plaintiff was fully incapacitated and had lost his entire earning power.